489 F.2d 998
 84 L.R.R.M. (BNA) 2476, 72 Lab.Cas. P 13,989
 Henry ROTA, Individually and for other members of Victory
Lodge 2151 of the Brotherhood of Railway, Airline
and Steamship Clerks, et al.,
Plaintiffs- Appellants,
v.
BROTHERHOOD OF RAILWAY, AIRLINE AND STEAMSHIP CLERKS et al.,
Defendants- Appellees.
 No. 73-1030.
 United States Court of Appeals, Seventh Circuit.
 Argued May 23, 1973.
Decided Oct. 1, 1973.
Certiorari Denied Jan. 14, 1974.
See 94 S.Ct. 896.
 
 Shayle P. Fox, Chicago, Ill., Morris H. Wolff, Philadelphia, Pa., Jeffrey S. Goldman, Chicago, Ill., for plaintiffs-appellants.
 Solomon I. Hirsh, Chicago, Ill., James L. Highsaw, Washington, D.C., for defendant-appellees.
 Before CLARK, Associate Justice,* CASTLE, Senior Circuit Judge, and STEVENS, Circuit Judge.
 STEVENS, Circuit Judge.
 
 
 1
 Plaintiffs challenge a ruling by the president of the Brotherhood of Railway, Airline and Steamship Clerks that a dues increase from $5.50 to $11.00 had been approved by the 1,235 delegates to a regular Union Convention on May 28, 1971. The district court entered summary judgment for defendants, holding that the undisputed facts showed that the increase had been approved by a majority vote as required by 101(a)(3)(B)(i) of the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 522, 29 U.S.C. 411(a)(3)(B)(i), and that the question whether the two-thirds requirement in the Union Constitution had been met related only to internal Union affairs which a federal court has no power to review. We believe there is sufficient confusion in the record on the question whether a majority voted in favor of the increase to preclude the entry of summary judgment.
 
 
 2
 The Convention was attended by 1,235 delegates representing about 200,000 Union members. The Union Constitution, which could be amended at a regular Convention by a two-thirds vote of the delegates present and voting, specified minimum monthly dues of $5.50 per member. In advance of the 1971 Convention, a number of proposals for increasing the dues were mailed to the delegates.
 
 
 3
 At the opening session of the Convention on Monday, May 24, 1971, procedural rules were adopted,[1] and various matters, including the subject of a dues increase, were referred to appropriate committees. On Friday afternoon the Convention Committee on Grand Lodge Constitution and Laws made its report, recommending an increase in dues to $10.00 effective July 1, 1971, and to $12.00 effective July 1, 1973, with a specified allocation among local lodges, system boards, and the Grand Lodge. Opposition to the allocation, to the amount of the increase, and to the two-step procedure developed. After a number of amendments were proposed, the subject was resubmitted to the Laws Committee for further consideration.
 
 
 4
 At the evening session the Committee submitted a report recommending an increase to $11.00 effective July 1, 1971. Again opposition developed on the floor of the Convention; amendments were proposed and either voted down or rejected for procedural reasons. The Chairman Spoke in favor of the increase, gave other delegates an opportunity to speak for and against, and then called for a vote. The transcript of the proceedings then reflects the following:
 
 
 5
 We will not vote on the Committee's report, and the Committee's was that the dues shall be $11.00 and the Grand Lodge portion would be $4.20 a month; the System Board portion $4.20; and the Local Lodge portion $2.60, with the understanding, as I stated previously, any General Chairman who thinks he does not need that much money can write in and get forgiveness from the International President.
 
 
 6
 Are you ready to vote?
 
 
 7
 . . . Calls for the question . . .
 
 
 8
 INTERNATIONAL PRESIDENT DENNIS: Those in favor of the Committee's report please raise your right hands. Down hands. Those opposed.
 
 
 9
 Well, let's see if we can see a little better by a standing vote. Those in favor of the Committee's report please rise.
 
 
 10
 . . . Those in favor of the motion arose . . .
 
 
 11
 INTERNATIONAL PRESIDENT DENNIS: Everybody rise who is in favor of the Committee's report, and we will have the Tellers tabulate their particular tables. It looks to me like we have two thirds.
 
 
 12
 . . . Cries of 'Oh' and applause . . ..
 
 
 13
 INTERNATIONAL PRESIDENT DENNIS: This is the Committee's amended report. You see, the TC Division over on this side of the house only has a half a vote.
 
 
 14
 . . . Cries of 'Roll call . . .'
 
 
 15
 INTERNATIONAL PRESIDENT DENNIS: And I will bet my right arm that there's two thirds of the Delegates standing.
 
 
 16
 . . . Cries of 'No' and 'Roll call' . . .
 
 
 17
 INTERNATIONAL PRESIDENT DENNIS: Now we are not going to gain anything by a lot of hollering. I will do what this Convention wants me to do. I am trying to be fair and honest about this thing. I could very easily say that this is a two-thirds vote.
 
 
 18
 So now, if anybody wants to get a little rough with the Chair, the Chair in turn will get a little rough with them. (Applause)
 
 
 19
 Now, I have tried to be considerate. (Applause)
 
 
 20
 I now declare we have a two-thirds vote standing. (Applause and cheers) And this is the ruling of the Chair. (Applause and cheers)
 
 
 21
 DELEGATE TOPPEN: Committee Report No. 5, page 4, Resolution No. 7, page 4.
 
 
 22
 DELEGATE F. M. SHEAHAN (TC Division 1): Mr. Chairman. Mr. Chairman.
 
 
 23
 INTERNATIONAL PRESIDENT DENNIS: What is the problem?
 
 
 24
 DELEGATE SHEAHAN: Point of privilege.
 
 
 25
 INTERNATIONAL PRESIDENT DENNIS: State it.
 
 
 26
 DELEGATE SHEAHAN: I have a point of privilege.
 
 
 27
 INTERNATIONAL PRESIDENT DENNIS: State your point.
 
 
 28
 DELEGATE SHEAHAN: I wish to challenge the Chair on the vote. (Applause and cheers)
 
 
 29
 DELEGATE JOAN D. BRDA (Lodge 36): I second the motion. (Applause)
 
 
 30
 INTERNATIONAL PRESIDENT DENNIS: All right. If two-thirds of the Delegates challenge the decision of the Chair, we will then have a roll call vote. (Applause)
 
 
 31
 Now, those delegates who wish to challenge the decision of the Chair please rise.
 
 
 32
 . . . Those who wished to challenge the decision of the Chair arose . . .
 
 
 33
 INTERNATIONAL PRESIDENT DENNIS: That is not two-thirds of the house. (Applause and cheers)
 
 
 34
 The decision of the Chair stands.[2] A few minutes later another delegate challenged the action of the President for not vacating the chair when the vote had been challenged.
 
 
 35
 INTERNATIONAL PRESIDENT DENNIS: Mike 2.
 
 
 36
 DELEGATE VICTOR F. LAGONIA (TC Division 17): Mr. President, a point of information. The delegate from the Canadian division appealed the decision of the president. Should not the president vacate the Chair and have some one other than him make another decision of the same one?
 
 
 37
 INTERNATIONAL PRESIDENT DENNIS: If I would have a two-thirds vote sustaining that delegate, I would have relinquished the Chair.
 
 
 38
 DELEGATE LAGONIA: You made the two-thirds decision twice.
 
 
 39
 INTERNATIONAL PRESIDENT DENNIS: Yes. And that stands.
 
 
 40
 DELEGATE LAGONIA: Well, I do not think that is according to Robert's rules.
 
 
 41
 INTERNATIONAL PRESIDENT DENNIS: Well, I think it is according to our convention rules, Brother. And our Convention rules prevail, except where we have no rule to cover, and then we go to Robert's.[3]
 
 
 42
 The record of the Convention proceedings does not disclose any attempt to ascertain the actual count of votes. The first vote on the dues increase was by a show of hands and the second by a standing vote. Apparently in both instances the chair made the determination, without the assistance of tellers, that the motion had carried. He also rejected the appeal from his decision on the basis of his own determination that the show of hands did not represent a two-thirds vote. The reliability of his determination may reasonably be questioned because he was an advocate of the increase, because a visual scan of over 1,000 persons in a large hall is imprecise at best and, in addition, because the votes of many delegates were weighted.
 
 
 43
 After the Convention adjourned, 165 delegates 'requested the International President to have their names recorded against the dues increase for many and varied reasons.' The significance of this request is unclear.
 
 
 44
 On June 21, 1971, plaintiffs, suing on behalf of 'similarly situated' Union members, commenced this action in the United States District Court for the Eastern District of Pennsylvania. That court, 338 F.Supp. 1176, held that an amended complaint attacking the dues increase stated a cause of action, but that venue was improper. The case was therefore transferred to the Northern District of Illinois where defendants' motion for summary judgment was granted.
 
 
 45
 The record includes the pleadings, the printed transcript of the Convention Proceedings, and various affidavits. The amended complaint challenges both the Convention procedures and the results of the vote on the dues increase. It alleges in paragraph seven:
 
 
 46
 'd) The membership of Victory Lodge 2151 was clearly opposed to such a drastic increase in dues, as was the majority of BRAC members who make up the class of plaintiffs in this action. A majority of the delegates also clearly opposed a dues increase of 100%. Chairman Dennis, however, was on record throughout the convention as being in favor of the dues increase. Chairman Dennis further more improperly induced certain Canadian delegates to vote in favor of the increase.
 
 
 47
 'e) Chairman Dennis refused to conduct a roll-call vote of the delegates on the issue of the dues increase despite repeated requests from the delegates that a roll-call vote on this important issue be taken. Even in the standing vote of the delegates which Chairman Dennis purported to conduct, which could not reflect the true voting powers of the delegates, considerably less than two-thirds of the delegates voted in favor, as required at the very least by the BRAC constitution. Instead, Chairman Dennis used threats and intimidations from the chair in an effort to silence debate and dissent and then 'gavelled through' the matter without any effort to determine by written ballot or roll call where each delegate stood on this closely contested issue, or to accurately determine the actual vote of the convention.'
 
 
 48
 The affidavits filed with plaintiffs' opposition to defendants' motion for summary judgment, when read with the printed record of Convention Proceedings, raise a factual question as to whether the dues increase was passed by a weighted vote of a majority of the delegates. Thus, the McCann affidavit stated, in part:
 
 
 49
 'The next motion was to raise the dues a flat $5.00 effective July 1. There was a discussion on the floor. The Canadian delegates bringing up the issue of a competitive union in their vicinity and explaining they would lose members. Brother Dennis informed them there would be an adjustment made in their locality so they need not be concerned. These Canadian delegates were still permitted to vote, although they were previously informed they would not be affected.
 
 
 50
 'The first vote was raising of hands. From my position I ascertained the vote as approximately fifty-fifty. Brother Dennis ruled the motion was passed. There was much groaning and dissension among the delegates.
 
 
 51
 'The next vote was taken by the delegates standing up from their seats.
 
 
 52
 'My observation was that about the same delegates that raised their hands pro and against now stood and sat down. I again estimated about fifty-fifty.
 
 
 53
 'Brother Dennis spent a minute or two looking around and again ruled the motion passed and the dues were raised $5.00 additional.
 
 
 54
 'Again there was much dissension
 
 
 55
 'Again there was much dissension Brother Dennis ruled the motion stood as the chair ruled.
 
 
 56
 'Many delegates walked out in disgust.
 
 
 57
 'In fact, the issue was brought up again the following day and ruled out of order irritating Brother Dennis very much.
 
 
 58
 'Inasmuch as delegates had varied voting strength, depending on the size of the Lodge of Lodges, they represented, it would be literally impossible to accurately determine the exact voting power exercised either way by the method used.
 
 
 59
 'All I can determine is that about half the delegates stood for the raise and about half the delegates stood against the raise. This was my own estimate from my vantage point in the rear of the auditorium.' A.48-49.
 
 The Browne affidavit states:
 
 60
 'I do not believe its was a simple majority let alone a Two Thirds Majority as required by our constitution, therefore I felt and still feel that a roll call vote should have been taken.' A.120.
 
 
 61
 The affidavit of W. B. Winchester states, in part:
 
 
 62
 'I was present and on the floor at the time the vote for a 100% dues increase was taken, it would raise the minimum dues from $5.50 to $11.00 per month. I was shocked at the high-handed and unfair procedures which took place.
 
 
 63
 'The Chairman asked those in favor of the committee's report to please raise their right hand. There were only a few hands raised, not nearly half of the room raised their hands in favor of the dues increase. He then asked for those who were opposed to raise their right hands more than 2/3 of the delegates in the room raised their right hands. Chairman Dennis, at this point, saw that the dues increase was lost and immediately called for a standing vote to see if he could determine a little better how the vote went. He asked for those in favor of the committee's report to rise. Only a small percentage of the delegates rose. He then asked for the delegates in favor of the committee's report to rise and 'we will have the tellers tabulate their particular tables' and stated 'it looks to me like we have 2/3rds'. The tellers did not tabulate the delegates at each table because immediately Mr. Dennis and his parliamentarian discussed this procedure and both of them realized that a tabulation of each table would be about the same as a roll-call vote.
 
 
 64
 'I was seated in a part of the room where I had a good opportunity to observe the procedures used in taking the vote and to see for myself how the delegates voted. I heard Chairman Dennis claim that a two-thirds majority had been obtained in support of the dues increase. This was just not so, and I was deeply disturbed by the Chairman suggesting that such a majority had been obtained. Immediately after the vote, I checked with the other members who were at the Convention and asked their opinion as to whether there was any possibility that I had misread the vote. The feelings of those with whom I spoke was almost unanimous that a two-thirds majority and possibly not even a simple majority was received in support of the dues increase. Chairman Dennis knows, to be truthful, that he did not receive the majority of the vote, I know it, and all those who were delegates at the Convention know it; . . .' A.132-134.
 
 
 65
 The affidavits submitted by plaintiffs are sufficient to raise a question of fact as to whether the dues increase was carried by a majority vote. Although the plaintiffs' attack in the district court focused primarily on the alleged shortcomings in Convention procedures, together with the claim that there was substantial reason to doubt that the two-thirds vote required by the constitution was obtained, we think it was error to interpret plaintiffs' position as, in effect, conceding that a majority vote favored the dues increase.[4] Plaintiffs' allegations and affidavits were sufficient to require defendants to demonstrate unambiguously that the requirement of the federal statute had been satisfied.
 
 
 66
 There is, of course, a general national policy against judicial interference in the internal affairs of unions. See Calhoun v. Harvey, 379 U.S. 134, 145, 85 S.Ct. 292, 13 L.Ed.2d 190 (Mr. Justice Stewart concurring); Gurton v. Arons, 339 F.2d 371, 375 (2d Cir. 1964). But that general policy is subject to important exception in specific areas in which Congress has found that the interests of individual members need special protection against the danger of overreaching by entrenched union leadership.[5] The subject of dues increases is such an area.
 
 
 67
 Congress has specifically required a secret ballot procedure for local labor organizations[6] and, with respect to national or international organizations, a majority vote at a regular convention, or a majority vote as a special convention held with adequate notice of the dues increase issue.[7] The statute does not undertake to specify the procedures that must be followed in voting on a dues increase. Necessarily, however, the word 'vote' connotes a fairly determined expression of the will of the union membership and a reliable and accurate count thereof. Since Congress has deemed the subject of dues increases sufficiently important to require statutory controls, it is also sufficiently important to require the union to demonstrate unambiguously that the statutory requirement has been met.
 
 
 68
 Since the record of the Convention proceedings fails to demonstrate that the majority vote requirement of 101(a)(3)(B) of the Act was satisfied, that issue must be resolved by trial.[8]
 
 
 69
 Plaintiffs have raised additional issues which we need not decide. Assuming the statutory requirement of a majority vote has been satisfied, the question whether the Union constitution has been breached raises issues of state law. Under the doctrine of pendent jurisdiction, there is no doubt that the federal district court would have power to decide such issues and, if appropriate, to grant relief. United Mineworkers of America v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218. But whether the district court should exercise that power is another question which should be addressed by that court in the first instance. We merely decide that it was error to enter summary judgment. After the actual weighted vote has been determined,[9] it will be time to face whatever issues may remain for decision.
 
 
 70
 Reversed and remanded.
 
 
 
 *
 The Honorable Tom C. Clark, Associate Justice of the Supreme Court of the United States, retired, is sitting by designation
 
 
 [1]
 Rule 14 covered the procedure for voting by delegates:
 'Rule 14. (A) The manner of voting shall be either by voice or a showing of hands at the option of the Chair. If the Chair is in doubt, he shall call for a division by a standing vote.
 '(B) A roll call vote (a vote by each delegate in accordance with his voting strength as shown on his credential) may be ordered by the Chair or upon the request of a two-thirds of the delegates present and voting provided this is done before any other business is taken up by the Convention. Once a roll call vote is ordered by the presiding officer, no recess shall take place nor shall any delegate be permitted to leave the hall until the result of the vote has been announced. The roll call list shall be the list of delegates present at the time roll is ordered as reflected in the most current report of the Committee on Credentials.' Brief for Appellants at 9.
 
 
 [2]
 Proceedings of the 24th Regular and Tenth Quadrennial Convention of the Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees Held at Miami Beach, Florida Fontainebleu Hotel Friday and Saturday, May 28, 29, 1971, pages 303-304
 
 
 [3]
 Proceedings, pages 304-305
 
 
 [4]
 In its Memorandum Opinion and Order the district court stated: 'Plaintiffs do not contend that the challenged increase was not approved by a majority vote of the delegates voting.' A. 138
 
 
 [5]
 See Wirtz v. Bottleblowers Assn., 389 U.S. 463, 473, 475, 88 S.Ct. 643, 19 L.Ed.2d 705; Hall v. Cole, 412 U.S. 1, 8-9, 14, 93 S.Ct. 1943, 1948, 1950, 36 L.Ed.2d 702 (May 21, 1973)
 
 
 [6]
 See 29 U.S.C. 411(a)(3)(A)
 
 
 [7]
 The relevant portion of the statute provides:
 'Except in the case of a federation of national or international labor organizations, the rates of dues and initiation fees payable by members of any labor organization in effect on September 14, 1959, shall not be increased, and no general or special assessment shall be levied upon such members, except--
 '(B) in the case of a labor organization, other than a local labor organization or a federation of national or international labor organizations, (i) by majority vote of the delegates voting at a regular convention, or at a special convention of such labor organization held upon not less than thirty days' written notice to the principal office of each local or constitutent labor organization entitled to such notice . . ..'
 
 
 [8]
 The fact that plaintiffs had filed their own motion for summary judgment is not inconsistent with the position that there are genuine factual issues. See M. Snower & Co. v. United States, 140 F.2d 367, 369-371 (7th Cir. 1944); Begnaud v. White, 170 F.2d 323, 327 (6th Cir. 1948)
 
 
 [9]
 We assume that most of the critical facts can readily be developed by appropriate discovery and stipulations, under the supervision of the district court, and that the trial need not include the testimony of 1,235 witnesses