**Lloyd R. HUMMEL and Robert A. Gartner, on behalf of themselves and all other members of Local 492, Bakery and Confectionery Workers' International Union of America, AFL–CIO, similarly situated**

v.

**Robert C. BRENNAN, Secretary-Treasury and George Szatkowsky, President-Business Manager and Local 492, Bakery and Confectionery Workers' International Union of America, AFL–CIO.**

Civ. A. No. 79–856

United States District Court,
E. D. Pennsylvania.

April 25, 1979.

1183

Barry E. Bressler, Herbert M. Linsenberg, Meltzer & Schiffrin, Philadelphia, Pa., for plaintiffs.

Mark P. Muller, Philadelphia, Pa., for defendants.

## MEMORANDUM OPINION

BECHTLE, District Judge.

Presently before this Court are the motion of the defendants to dismiss, pursuant to Fed.R.Civ.P. 12(b)(1), and the motion of the plaintiffs for a preliminary injunction, pursuant to Fed.R.Civ.P. 65. After careful review and consideration of the testimony

and exhibits presented by the parties at the preliminary hearing and the supporting pleadings, briefs and arguments of counsel, the Court makes the following narrative findings of fact and conclusions of law.

This case has been filed as a class action, pursuant to Fed.R.Civ.P. 23, by plaintiffs Lloyd R. Hummel ("Hummel") and Robert A. Gartner ("Gartner"), on behalf of themselves and all other similarly situated members of Local 492, Bakery and Confectionery Workers' International Union of America, AFL–CIO, against defendants Robert C. Brennan, Secretary-Treasurer of Local 492; George Szatkowsky, President-Business Manager of Local 492; and, Local 492 of the Bakery and Confectionery Workers' International Union of America, AFL–CIO ("Local"). Jurisdiction for this action is based upon Section 102, 29 U.S.C. § 412 of the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"), *as amended,* 29 U.S.C. § 401, *et seq.*[1] The plaintiffs challenge the method by which the Local effectuated a dues increase by ballot vote at five separate shop unit meetings, on the ground that the voting procedure violated Section 101, 29 U.S.C. § 411(a)(3)(A), and the constitution and bylaws of Local 492. The plaintiffs pray: (1) for a preliminary injunction enjoining the defendants from checking-off the increased dues rate; (2) an order requiring defendants to return to members of the class any excess dues which have been collected; and, (3) the awarding of attorneys' fees and costs.[2] The defendants have responded by filing a motion to dismiss the complaint, claiming a failure of the plaintiffs to first exhaust internal union remedies pursuant to 29 U.S.C. § 411(a)(4).

## FINDINGS OF FACT

The relevant facts in the instant case are as follows: On January 2, 1979, a notice was posted, pursuant to action taken by the Executive Board of Local 492, at all shop unit locations concerning the scheduling of a general membership meeting on January 7, 1979. The notice contained no indication that a union dues increase would be discussed or voted upon at that meeting. The following day, another notice was posted at the Nabisco plant detailing the scheduling of a union meeting of Nabisco workers on January 14, 1979. This notice also failed to make any mention of a dues increase proposal or vote. On January 7, 1979, the general membership meeting was held and was attended by approximately 35 to 40 members of Local 492. The poor attendance was attributed, in part, to inclement weather. At that meeting, the issue of a Local dues increase was raised from the floor by a member of the Executive Board. Based on a voice vote, it was determined that the question of a dues increase would be scheduled for a vote by the general membership of the Local at their respective next-scheduled shop unit meetings. Two days later, a notice was posted on all bulletin boards at the five plants by the Executive Board indicating that the issue of a dues increase would be voted upon at "your Shop Unit meeting." The proposed dues rate schedule was also set forth in the notice to the members. Subsequently, voting was conducted at the five shop units either at the plants or at union halls.

On January 25, 1979, the combined results of the five shop unit votes were posted indicating that, of those members present and voting at the meetings, 472 were in favor of a dues increase, 284 were opposed and 2 ballots were declared void. On February 2, 1979, plaintiffs sent a letter to the General Executive Board of the Bakery and

---

1. The pending motion for class certification will not be addressed by the Court at this time.

2. Shop unit meetings were held: on January 10, 1979, at the Bon Ton Potato Chip Company ("Bon Ton"), York, Pennsylvania; on January 14, 1979, at Nabisco, Inc. ("Nabisco"), Philadelphia, Pennsylvania; on January 16, 1979, at V. LaRosa & Sons, Inc. ("LaRosa"), Warminster, Pennsylvania; on January 20, 1979, at Philadel-phia Macaroni Co., Inc. ("Philadelphia Macaroni"), Philadelphia, Pennsylvania; and, on January 21, 1979, at Keebler Company ("Keebler"), Philadelphia, Pennsylvania. The Nabisco, Keebler and Bon Ton shop unit meetings were held at halls regularly used for union functions, and the LaRosa and Philadelphia Macaroni shop unit meetings were held at the actual plants.

Confectionery Workers' International Union of America ("International Union"), notifying them of the plaintiffs' and other members' protest of the election procedures utilized at the shop unit meetings to enact the dues increase and that a complaint had been filed with the Local's union board in that regard. After review, on February 27, 1979, the Local's Executive Board informed the plaintiffs that their complaint lacked merit. Commencing approximately March 4, 1979, the dues increase was reflected in the dues deducted from the paychecks of all members of the Local.[3] The next day, an appeal was filed with the International Union's General Executive Board by the plaintiffs protesting the Local board's decision. The International Union informed the plaintiffs on March 19, 1979, that their appeal had been received and would be acted upon by the International Union "shortly." The hearing before this Court was held on March 21, 1979.

Based upon the foregoing facts, the Court is faced with two conflicting motions of the parties—defendants' motion to dismiss and plaintiffs' motion for preliminary injunction.

### I. Motion to Dismiss

The defendants have filed a motion to dismiss the plaintiffs' complaint based upon the failure of the plaintiffs to exhaust union administrative remedies. In support of their motion, defendants refer to 29 U.S.C. § 411(a)(4), which provides:

> Protection of the right to sue.—No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency, irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding, or the right of any member of a labor organization to appear as a witness in any judicial, administrative, or legislative proceeding, or to petition any legislature

or to communicate with any legislator: *Provided, That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof: And provided further,* That no interested employer or employer association shall directly or indirectly finance, encourage, or participate in, except as a party, any such action, proceeding, appearance, or petition.

(Emphasis added.) Defendants argue that this exhaustion-of-remedies provision requires that the plaintiffs exhaust all appeals to the International Union before this Court can exercise jurisdiction.

The purpose of the above provision is to compel employees to seek internal union relief before requesting the aid of the courts. *Goclowski v. Penn Cent. Transp. Co.,* 571 F.2d 747, 758 (3d Cir. 1977). This rationale is based upon a Congressional policy in favor of union self-government. *Semancik v. United Mine Workers of America,* 466 F.2d 144, 151 n. 6 (3d Cir. 1972). The decision is ultimately at the discretion of the trial judge, *Amalgamated Cloth. Workers v. Amalgamated Cloth. Workers,* 473 F.2d 1303, 1308 (3d Cir. 1973); *Semancik v. United Mine Workers of America, supra,* 466 F.2d at 151 n. 6, and the federal courts are not bound by state court exhaustion-of-remedies decisions. *Detroy v. American Guild of Variety Artists,* 286 F.2d 75, 78 (2d Cir.), *cert. denied,* 366 U.S. 929, 81 S.Ct. 1650, 6 L.Ed.2d 388 (1961); *Deluhery v. Marine Cooks and Stewards Union, AFL–CIO,* 199 F.Supp. 270, 274 (S.D.Cal.1961). Therefore, the Pennsylvania decisional law cited by the defendants is inapposite.

There are certain court-created exceptions to the general rule requiring the exhaustion of remedies. The relevant ex-

---

**3.** By order of the International Union on January 1, 1979, pursuant to Article XVI, § 4 of the International Constitution, a $2.00 per month dues increase was imposed. Since that time, the Local has been paying an assessed per capita tax of $1.00 per member per month, although the $2.00 increase has not been assessed against the Local 492 membership.

ceptions here include: a showing of irreparable harm to the plaintiff/union member which is either job related or will affect the exercise of his rights under the LMRDA, *Semancik v. United Mine Workers of America, supra,* 466 F.2d at 150; and, a showing that it would be futile to require the plaintiff to first exhaust internal union remedies. *Goclowski v. Penn Cent. Transp. Co., supra,* 571 F.2d at 758; *McGovern v. International Bro. of Teamsters,* 447 F.Supp. 368, 372 (E.D.Pa.1978).

■ Based on the unique circumstances presented here, irreparable harm has been shown by the plaintiffs. The dues increase amounts to a 20% to 45% increase over the pre-increase uniform rate of $9.00 per month paid by each member since 1977. Furthermore, the dues increase materially alters the dues structure from a flat rate to a percentage of each worker's weekly salary. For example, in the case of a worker earning $8.60 per hour—based on the dues ratio of $8.60 × ½ hour's pay per week × 4.3 weeks per month—the dues rate would amount to $18.50 per month, as opposed to the previous flat rate of $9.00 per month. The Court finds that such an increase is substantial in amount, unusual in effect and a departure from the union's historic financial formula connecting it with its membership. Defendants' contention, that the ultimate resort to litigation to recover the monetary damages compensates for this loss, is impracticable and patently unrealistic. To force Local members to seek monetary damages at some future date would compel separate suits for relatively small sums of money damages. When such claims are balanced against the costs in time, money and delay of individual suits, such a course is easily seen as an undue and unnecessary burden on the workers affected.

The court in *Independent Tape Merchant's Association v. Creamer,* 346 F.Supp. 456, 459 (M.D.Pa.1972), held that, where there would be the necessity for numerous suits between the same parties involving identical issues, this multiplicity of suits could constitute irreparable injury.

The argument that monetary damages could be viably sought through a class action complaint is also equally unpersuasive here. A class action complaint for monetary damages would necessitate expending equal, if not greater, amounts of time and cost for the individual litigants. In any event, because of the claims seeking relief due to the denial of the statutory entitlement to a secret ballot on dues increases, monetary damages are inadequate here because these non-monetary claims are immeasurable. *See A.L.K. Corporation v. Columbia Pictures Industries, Inc.,* 440 F.2d 761, 764 (3d Cir. 1971); *Miller v. American Telephone & Telegraph Corporation,* 344 F.Supp. 344, 349 (E.D.Pa.1972). The loss of crucial voting rights of the union membership provided under federal law cannot be readily defined in terms of dollars and cents.

Therefore, it would be futile to require the plaintiffs here to first exhaust internal union remedies, in light of the showing at this juncture of irreparable harm suggesting immediate need for relief, as compared to the indefinite future administrative resolution of the dispute represented by the International Union's current response to plaintiffs' appeal filed on March 5, 1979, that it would be acted upon "shortly."

Having found two exceptions to the general rule requiring exhaustion of internal union remedies, the Court has denied the defendants' motion to dismiss.

II. *Motion for a Preliminary Injunction*

The Supreme Court in *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975), set forth the standard to be applied by courts addressing a motion for a preliminary injunction: "The traditional standard for granting a preliminary injunction requires the plaintiff to show that in the absence of its issuance he will suffer irreparable injury and also that he is likely to prevail on the merits." *Id.,* at 931, 95 S.Ct. at 2568. In addition, the Third Circuit has considered the following factors when determining the propriety of a motion for a preliminary injunction: (1) the possi-

bility of harm to the other interested persons from the grant or denial of the injunction; and, (2) the public interest. *Constructors Ass'n of Western Pennsylvania v. Kreps,* 573 F.2d 811, 815 (3d Cir. 1978). *See also A.L.K. Corporation v. Columbia Pictures Industries, Inc., supra,* 440 F.2d 761, 763 (3d Cir. 1971); *Doe v. Colautti,* 454 F.Supp. 621, 624 (E.D.Pa.1978); *Salsburg's Meats, Inc. v. Shultz,* 363 F.Supp. 269, 272 (E.D.Pa.1973).

 A showing of irreparable injury *pendente lite* must be based upon actual injury of a serious nature and not be merely theoretical. *A.L.K. Corporation v. Columbia Pictures Industries, Inc., supra,* 440 F.2d at 764. Additionally, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Virginia Petroleum Job. Ass'n v. Federal Power Com'n,* 104 U.S.App.D.C. 106, 110, 259 F.2d 921, 925 (1958), quoted with approval in *Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974), and *United States v. Commonwealth of Pennsylvania,* 533 F.2d 107, 110 (3d Cir. 1976). Monetary loss alone is not enough to constitute irreparable injury. *Salsburg's Meats, Inc. v. Shultz, supra,* 363 F.Supp. at 272. Consideration of the above factors requires the Court to maintain a delicate balance of all the elements, with no one factor being the sole determinate. *Constructors Ass'n of Western Pennsylvania v. Kreps, supra,* 573 F.2d at 815. Finally, the Court's purpose here is to attempt to satisfy the goal that has recently been articulated by the Third Circuit that the district court "must attempt to minimize the probable harm to legally protected interests between the time that the motion for a preliminary injunction is filed and the time of the final hearing." *Constructors Ass'n of Western Pennsylvania v. Kreps, supra,* 573 F.2d at 815.

Therefore, examining the motion in the light most favorable to the moving party, *Salsburg's Meats, Inc. v. Shultz, supra* at 272, the Court finds that irreparable injury will occur to the plaintiffs if the prelimi-nary injunction is not granted, and that monetary damages are inadequate because they are immeasurable to compensate for the loss of voting rights.

On the other hand, the Local has not set forth on the record any showing that any harm will inure to its interests if the preliminary injunction is granted. Further, no direct question of public interest is presented here in the context of it being a major consideration in the Court's ruling.

The second requirement for the granting of a motion for a preliminary injunction is that the movant show a likelihood of success on the merits. The Court finds that the plaintiffs have shown a substantial likelihood of succeeding on the merits of their claims that the Local membership was not afforded reasonable notice of the general membership vote on the dues increase, and that a vote by secret ballot by only members in good standing, as required by 29 U.S.C. § 411(a)(3)(A), was not conducted by the Local at the five mid-January 1979 shop unit meetings.

### A. *Notice*

Plaintiffs' first claim is that there was inadequate notice for the five mid-January 1979 shop unit meetings at which the proposed dues increase was voted upon. The plaintiffs cite in support thereof Article XII of the constitution and bylaws of Local 492, which provides, in relevant part:

Any amendment to the Local Constitution and By-Laws may be proposed, and made a recommendation by a two-thirds (2/3rds) majority of the members in attendance at a regular or special Local Executive Board meeting, or by a two/thirds (2/3rds) majority of the members in attendance at a regularly scheduled General Membership Meeting, and after notice posted at the Union Office and plant bulletin Boards announcing such recommendations, *a secret ballot vote will be held at the following month's regularly scheduled Shop Unit meeting of each Shop Unit.* Upon adoption by a majority of the combined total voting at

said Unit meetings, the recommendations shall become a part of this Constitution. (Emphasis added.)

The plaintiffs further refer to Section 101 of the LMRDA, 29 U.S.C. § 411(a)(3)(A), providing:

*Dues, initiation fees, and assessments.* —Except in the case of a federation of national or international labor organizations, the rates of dues and initiation fees payable by members of any labor organization in effect on September 14, 1959 shall not be increased, and no general or special assessment shall be levied upon such members, except—

(A) in the case of a local labor organization, (i) by majority vote by secret ballot of the members in good standing voting at a general or special membership meeting, after reasonable notice of the intention to vote upon such question, or (ii) by majority vote of the members in good standing voting in a membership referendum conducted by secret ballot . . . .

Plaintiffs' argument is grounded upon two points: (1) whether there was reasonable notice of the five mid-January 1979 shop unit meetings; and, (2) whether the membership of the Local was deceived by the January 9 notice and believed that the vote on the dues increase would take place at the February shop unit meetings, as opposed to the January meetings.

The defendants argue that the notice given was reasonable, in light of past practices, in that notices were usually posted 10 to 14 days before the meetings but occasionally as little as 7 days before the meetings.

■ Reasonableness of notice under § 411(a)(3)(A) must be interpreted based upon the factual circumstances of each case and is not readily definable in terms of a certain number of days. Further, while previous union notice practices are important factors for the Court to consider when determining reasonableness, they are not solely determinative. Unreasonable notice practices in the past will not serve to justify the continuation of such practices. With these principles in mind, the Court finds that reasonable notice was not given for any of the five mid-January 1979 shop unit meetings.

The issue of a proposed dues increase was not brought before the general membership of the Local until a proposal from the floor at the sparsely attended January 7, 1979, general membership meeting. The January 9 notice of the proposal did not specify with any degree of certainty when the proposal would be voted upon by the Local membership. The phrase, "at your Shop Unit meeting" contained in the notice was inherently ambiguous, in light of the language in Article XII of the constitution and bylaws of Local 492 which provides that dues increases are to be voted upon at the "following month's" shop unit meeting after being proposed to the general membership. The following month here would have been February 1979.

■ However, in *Martire v. Laborers' Local Union 1058,* 410 F.2d 32 (3d Cir. 1969), the Third Circuit held that a "violation of a union or district council's constitution is not actionable *per se* under the LMRDA." *Id.,* at 36. Federal courts do not possess jurisdiction to enforce the constitution or bylaws of a union unless there has been a specific violation of a right under Section 411. *McGovern v. New Orleans Clerks & Checkers, Local 1497 ILA,* 343 F.Supp. 351, 352 (E.D.La.1972). There are certain judicial exceptions to this general rule. In *Bunz v. Moving Picture Mach. Operators', Etc.,* 567 F.2d 1117 (D.C.Cir.1977), the court found a violation of a union's bylaw requiring a two-thirds vote for a dues assessment although only a majority vote was required under the statute. 29 U.S.C. § 411(a)(3)(A). The court concluded that "[t]he federal court here need do no more than tell the union to play by its own rules." *Id.,* at 1124. The *Bunz* court noted:

This is not to say, of course, that every time a union breaks its rules it thereby violates § 101(a)(1). . . . The existence of a violation depends on whether, under all the circumstances of the case, the union has discriminated against some

of its members and robbed their votes of meaning. But in making this determination the court will naturally consider whether the union has flouted its rules; the egregiousness of the violation, if any; the bad faith in which the violation occurred; and the impact of the violation on the election's outcome.

*Id.,* at 1124 n. 53.

This Court finds these principles equally applicable here and, consequently, agrees that the Court cannot grant relief solely on the basis of a violation of the constitution and bylaws of Local 492. The key is whether or not the notice given was "reasonable." A determination of "reasonableness" depends on many factors. One factor to be considered here is the Local 492 constitution and bylaws provision defining the manner in which notice is to be given. This Court finds the Local's constitutional provision to be a fair and adequate procedure from the viewpoint of reasonableness. The voting procedures, as actually carried out, deprived the union members of their voting rights under the LMRDA by not furnishing the reasonable notice provided for in the Local's constitution in respect to a crucial dues increase vote. The Local has offered no acceptable justification for its failure to follow the notice provisions.

Furthermore, even if there had been no Local constitutional notice provision, the notice given was unreasonable under § 411(a)(3)(A) because of the minimal time period provided between the posting of the notices and the shop unit meetings at the individual plants. At the Nabisco plant, notice of the proposed dues increase was not posted until January 9, thereby providing only five days' notice before the January 14 shop unit meeting. Notice at the Bon Ton plant was not posted until January 8, only allowing two days' notice before the Bon Ton shop unit meeting. At the Keebler plant, notice was posted only six days before the January 21 shop unit meeting. Further, the Local failed to adequately explain why notice at the Keebler plant was not posted until six days after the proposal was first raised at the January 7 general

membership meeting. Finally, notices at the Philadelphia and LaRosa plants were posted on January 9, with voting occurring eleven days later at the Philadelphia Macaroni plant and seven days later at the LaRosa plant. While eleven days, or even seven, *may* be sufficient for most persons to be notified to appear, deliberate, decide and vote on such an important issue, it would in the Court's view be barely so. Less than a week would clearly be too short and, unless *all* members received adequate notice, it is the Court's view that *no one* received adequate notice. Accordingly, the Court finds that notices to plaintiff members were unreasonable under § 411(a)(3)(A) for failure to allocate sufficient time in which Local 492 members could adequately and fully discuss, debate and contemplate the far-reaching dues increase proposal.

The Court further finds that the January 9 notice was misleading in that it failed to clearly define when the proposed dues increase would be voted upon. The likelihood of misunderstanding was further bolstered in light of the Local 492 constitutional provision providing that dues increases shall be voted upon at the "following month's" shop unit meetings, which would have been in February rather than January, as was the case.

The plaintiffs cite *Gates v. Dalton,* 441 F.Supp. 760 (E.D.N.Y.1977), to support their contention that notice here was unreasonable. In *Gates,* the court examined a § 411(a)(3) dues increase vote and held that prior notice was unreasonable under the factual circumstances. The notice in *Gates* was contained in a letter to the local membership stating that, " '[o]ur next regular meeting on June 9, 1972 will be a special meeting to discuss further financing of the building and a possible change in our dues structure'." *Id.,* at 762. The Court stated that, "[t]he critical query is whether the letter can fairly be said to convey any intention on the part of the Local to have a vote on the dues increase proposal which was placed before the meeting." *Id.,* at 763. The test applied by the *Gates* court to determine "reasonableness" under the stat-

ute was whether the notice, " 'descends to particulars, and the ordinary union member, attentive to the interests he has at stake in such a situation, is, in some manner, thereby made aware of the specific issue to be voted upon a reasonable time in advance of the meeting.' " *Id.,* at 763, *quoting Gates v. Dalton,* 67 F.R.D. 621, 628 (E.D.N.Y.1975). The *Gates* court found the notice to be unreasonable because it was ambiguous and did not fairly convey an intention on the part of the union that a dues increase would actually be voted upon at the scheduled meeting. So, too, the notice in the case *sub judice* carries the same stigma.

Applying the *Gates* standard, we find that the January 9 notice did not descend to particulars, was ambiguous and failed to convey any intention on the part of the Local as to when the dues increase proposal would be voted upon by the general membership. *Gates* held that "reasonable notice" is a factual determination and here, based upon the factual circumstances, the Court finds all notices, including the January 9 notice of the proposed dues increase, to be unreasonable under § 411(a)(3)(A). This finding is based upon the following considerations: (1) Article XII of the constitution and bylaws of Local 492 considered in light of surrounding circumstances; (2) the length of time between the posting of notices and the mid-January 1979 shop unit meetings; and, (3) the possibility of misunderstanding by the Local membership due to ambiguity in the posted notices.

### B. *Secret Ballot*

█ Plaintiffs attack the validity of the dues increase on the ground that the Local failed to provide for "secret ballot" voting by only "members in good standing," as required by 29 U.S.C. § 411(a)(3)(A). A secret ballot is defined for purposes of the entire LMRDA under 29 U.S.C. § 402(k) as:

> "Secret ballot" means the expression by ballot, voting machine, or otherwise, but in no event by proxy, of a choice with respect to any election or vote taken upon any matter, which is cast in such a manner that the person expressing such

choice cannot be identified with the choice expressed.

A factual examination of the election procedures as disclosed during testimony at the preliminary hearing is valuable in order to determine whether the Local complied with the requirements of § 411(a)(3)(A) of the LMRDA. The major portion of the testimony presented focused on the specific election procedures occurring at the January 14, 1979, Nabisco meeting. However, because the Local has acknowledged that the Nabisco election procedures were significantly equivalent to the voting procedures at the other four shop unit meetings, and because an invalid election at the largest shop unit would vitiate the entire election for all shops, our discussion of statutory compliance will be based upon the Nabisco election procedures.

The January 14 Nabisco shop unit meeting was conducted at a hall frequently used for union functions. Persons entering the hall were not checked at the door by a Sergeant-at-Arms or any other person in order to certify whether those persons entering were members "in good standing" of the Local. One witness testified that she was admitted to the hall even though she was not a member of the Local and was never asked for her membership card or whether she was a member. As persons entered the hall, they were asked to move toward the front of the room where chairs had been arranged in horizontal rows. As the seats in the rows were filled, there was little if any space between individual voters. A ballot box was placed on a counter on the side of the room. No tables were provided at which voters could mark their ballots, nor was there any area in the room specifically set aside to ensure privacy for voters when casting their ballots.

Pursuant to the meeting agenda, a discussion of the proposed dues increase took place. After the discussion, plaintiff Hummel attempted to move for the implementation of a check-off system to ensure that only members in good standing voted or, in the alternative, that the vote be postponed until the February meeting. After the dis-

cussion, election officials went to the end of each row of chairs and counted the numbers of persons in each row without making any attempt to determine whether only members in good standing were seated in each row. After this head count, an appropriate number of ballots were distributed to the person at the end of each row, who proceeded to pass them down the remainder of the row. Voters cast their votes by holding the ballots in their laps and marking an "X" on the ballot either for or against the dues increase. The voters were not provided with pencils and many were required to borrow pencils from others who had them before they could vote. No instructions were given by the election officials or the Executive Board of the Local regarding a member's right to vote secretly, nor were designated areas provided for that purpose. Some voters did get up from their chairs and voted in other areas of the hall.

One witness testified that, although she was a non-member, she was given a ballot which she returned unmarked to the election official. When the voters finished marking their ballots, they proceeded to the ballot box at the side of the room to deposit their ballots. The election official at the box did not attempt to initiate a "check-off" system to see whether only members in good standing were voting or, indeed, whether the voter was a member in good or bad standing. Although there was no testimony that any non-member actually voted, there was testimony that one person said she had taken more than one ballot and had voted three times, although there was no other evidence that she did deposit the three ballots. The point here is not so much whether she did or did not vote three times but, rather, whether *any* precautions at *all* were taken to prevent abuse of voting privileges. During the entire election procedure, no particular official was solely responsible for establishing voting procedures or for the physical layout of the hall. Rather, the Court finds that the election procedures and physical layout of the hall were dictated by mere happenstance.

Plaintiffs rely upon the recent decision of the Third Circuit in *Marshall v. Steelwork-*

*ers, Local 12447,* 591 F.2d 199 (3d Cir. 1978), which involved an election of union officers. In *Marshall,* the Secretary of Labor claimed a failure by the union to comply with the secret ballot provisions of 29 U.S.C. § 481(b). For purposes of that section, "secret ballot" is defined in the general definitional section of the LMRDA, 29 U.S.C. § 402(k). In *Marshall,* the members were given slips of paper upon entering a meeting hall, which they thereafter surrendered for a ballot. They proceeded to one of seven tables in the same room to vote. No instructions were given to the voters as to where they could mark their ballots and, as a result, some voters marked their ballots while leaning against the walls of the hall. Although the tables were equipped with boxes inside which the voters could mark their ballots in secret by using the sides of the box as a privacy shield, no instructions were given as to the use of the boxes. Further, the voting area was congested and there was no control over the voter flow into the area.

The *Marshall* court held that the union failed to comply with the secret ballot requirement of § 481(b). The court stated that the local union is affirmatively required to take all reasonable steps to ensure that every voter marks his ballot in secrecy, and they must inform the voters that they must use boxes when provided for voting. Furthermore, the court held that the admission of voters to the voting area must be controlled so that the number of voters voting coincides with the available number of boxes in which to mark their ballots. However, the court noted that the physical arrangement employed was not critical but stated:

> ". . . A union must also take every reasonable precaution to ensure that the facilities available for balloting are used in a manner similar to their use in political elections in this country, i. e., in such a manner that voters cannot be identified with their choices.

591 F.2d at 205.

Once a *prima facie* case is established, the *Marshall* court stated, the burden shifts to the union to show that the violation did not affect the outcome of the election. In *Mar-*

*shall*, the union did not present such a showing and, therefore, the court ordered the election declared void and a new election to be conducted under the supervision of the Secretary of Labor.

Defendants contend that the requirements set forth in *Marshall* are not applicable here, since *Marshall* concerned an election of officers under § 481(b) and the statutory purpose behind that section is different from that behind § 411(a)(3)(A). However, defendants fail to offer any decisional or statutory authority to support their contention.

While *Marshall* did concern an election for officers under § 481(b), the requirements of that section calling for a secret ballot are analogous to those under § 411(a)(3)(A). Further, the definition of secret ballot under § 402(k), applicable to § 481(b), is equally applicable to § 411(a)(3)(A).

In *Rota v. Brotherhood of Railway, Airline & S.S. Clerks,* 489 F.2d 998 (7th Cir. 1973), the court stated that the general policy against judicial interference with internal union affairs "is subject to important exception in specific areas in which Congress has found that the interests of individual members need special protection against the danger of overreaching by entrenched union leadership. The subject of dues increases is such an area." *Id.,* at 1003. *See also Wirtz v. Bottle Blowers Assn.,* 389 U.S. 463, 473, 475, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968). In *Rota v. Brotherhood of Railway, Airline & Steam. Clerks,* 338 F.Supp. 1176 (E.D.Pa.1972), in a § 411(a)(3)(B) action, the court held that the purpose of § (3)(B) "is to preserve and protect a Union member's right to determine the amount of dues that he will pay . . . ." *Id.,* at 1179. The requirement of a secret ballot vote under the LMRDA was meant to provide "an absolute protection for the working man, and any vote that dispenses with it is invalid as repugnant to the statute." *White v. King,* 319 F.Supp. 122, 124–125 (E.D.La.1970). *See also King v. Randazzo,* 346 F.2d 307, 309 (2d Cir. 1965).

To require a lesser standard for voting on dues increases than for the election of officers does not comport with the Congressional concern of the "overreaching of entrenched union leadership," and is not supported by a fair reading of the statute, which applies the same requirements and definition of secret ballot to both provisions. Thus, we find the requirements of the *Marshall* decision equally dispositive of a challenge to a dues increase under § 411(a)(3)(A). We place emphasis on the plain language of the statute which mandates that a voter "cannot be identified with the choice expressed," 29 U.S.C. § 402(k), and that only "members in good standing" vote. 29 U.S.C. § 411(a)(3)(A).

The balloting procedures utilized here were not secret for several reasons. First, the ballots were marked by each voter at his seat, which was situated directly adjacent to his neighboring voter. Second, the voters were not instructed that they could vote in secret in other areas of the hall. Although some voters did move from their seats to other areas to vote, the choice to vote in secret that was exercised by a few voters in the absence of general instructions, does not help the defendants' case. The *Marshall* court stated that, " . . . [i]n some cases, the very exercise of this choice in favor of a secret vote may identify the voter as a dissident or at the least may chill the exercise of the voter's free choice." 591 F.2d at 205. Here, those voters desiring to vote in secret, in areas other than in their seats, had to act in such a manner that they could be identified with their choices.

In the instant case, the Local officials did not take any reasonable precaution to ensure that election facilities were provided so that voters would not be identified with their choices, as required under *Marshall* and § 402(k). In the past, the Local used tables for voting and supplied pencils to voters. Here, neither method was used, even though unused tables were stacked along the back of the hall and there was ample space and manpower to assemble them. The layout of the hall was such that voters could have been seated farther apart

and pencils could have been provided to ensure a greater degree of privacy.[4] These voting procedures were clearly faulty. The Local has not overcome the *prima facie* showing that the election procedures could have identified voters with their choices, in violation of §§ 411(a)(3)(A) and 402(k).

Section 411(a)(3)(A) further requires that only members in good standing may vote. No check-off system was provided here to ensure that only members, and only those members in good standing, be admitted to the voting hall. A Sergeant-at-Arms was not present, as required under Article XVI, section 23 of the constitution and bylaws of the International Union. One witness testified that she was admitted to the hall although she was not a member and she was never questioned as to her identity. Further, when the ballots were distributed, no attempt was made to determine that only members in good standing received ballots. One person who was not a member did receive a ballot as a result of the failure to provide a check-off system. Finally, no attempt was made to ensure that only members in good standing deposited ballots in the ballot box.

For the reasons stated above, this Court finds that the Local failed to satisfy the requirements of § 411(a)(3)(A) and § 402(k) of the LMRDA at the January 14, 1979, Nabisco shop unit meeting and the other four plant shop unit meetings which were similarly conducted.

## CONCLUSIONS OF LAW

By reason of the foregoing, the Court concludes that plaintiffs have shown that irreparable injury will result if a preliminary injunction is not granted; that there is a high likelihood that plaintiffs will prevail on the merits at the final hearing; that no undue hardship will befall the defendants if the injunction is issued; and, that no harm to the public interest will result if the injunction is issued.

This Memorandum Opinion is in support of the Court's Order dated April 5, 1979.

An appropriate Order is being entered this date scheduling the Final Hearing on Preliminary Injunction.

---

4. Although no testimony was presented to indicate that voters were actually viewing each other's ballots or that there was a chilling effect on privacy, this showing is not required under *Marshall*. The court there stated: ". . . Once it is shown that that method was deficient because voters *could* have been identified with their choices, there is no additional requirement that union members come forward to testify that they took advantage of this opportunity to view other voter's ballots." 591 F.2d at 203 n. 10 (emphasis in original).