Margaret KELLY, Plaintiff,

v.

LOCAL NO. B–183 OF the INTERNATIONAL ALLIANCE OF THEATRICAL STAGE EMPLOYEES, Defendant.

No. 80 Civ. 3390 (JES).

United States District Court, S.D. New York.

June 24, 1983.

James V. McGovern, White Plains, N.Y., for plaintiff.

Edward J. Quinlan, New York City, for defendant.

## OPINION & ORDER

SPRIZZO, District Judge.

Plaintiff, Margaret Kelly, commenced this action against Local B–183 of the International Alliance of Theatrical Stage Employees (the "Union") alleging that the Union deprived her of her right to a secret ballot in connection with a vote on a dues increase, in violation of § 101(a)(3)(A) of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 411(a)(3)(A) (hereinafter "§ 411(a)(3)(A)").[1]

In or about November 1979, the Union conducted an open vote for a dues increase

of $2.00 per year per member. Consent Pre-Trial Order, Undisputed Facts at (5)C (hereinafter "PTO"). Although the dues increase was approved, plaintiff contested the increase, contending that the vote had not been taken by secret ballot. *Id.* at (5)D. She was thereafter suspended from membership for failure to tender the dues increase. Amended Verified Complaint at paras. Seventeenth—Nineteenth; Amended Verified Answer at para. 5. As a consequence, plaintiff complained to the Union's parent organization, the International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States and Canada, which conducted a hearing. Amended Verified Complaint at paras. Fourteen, Twentieth. As a result of that hearing, plaintiff was reinstated, and the Union was directed to conduct the dues increase vote by secret ballot. *Id.* at para. Twenty-First; PTO at (5)E.

On June 20, 1980, the Union conducted balloting for a dues increase retroactive to January 1, 1980. *Id.* at (5)F. The procedure used with respect to that vote was as follows. To receive a ballot, Union members were directed to a table where, after their dues books were checked to determine whether they were members in good standing, they were required to sign an attendance book which contained 265 pre-numbered signature lines. Trial Transcript at 22, 65, 120–21, 135, 137, 140 (hereinafter "Tr. ——"); Plaintiff's Exhibit 1. They then proceeded to the end of the table where ballots were handed out face down. Tr. at 67. During the course of the balloting plaintiff complained both that the ballots were numbered and that she and other members had received ballots exactly one hundred numbers higher than their sign-in numbers. Tr. at 29; PTO at (5)G. Two

1. Section 411(a)(3)(A) provides, in pertinent part:

> Dues, initiation fees, and assessments.—Except in the case of a federation of national or international labor organizations, the rates of dues and initiation fees payable by members of any labor organization in effect on September 14, 1959 shall not be increased, and no general or special assessment shall be levied upon such members, except—

> (A) in the case of a local labor organization, (i) by majority vote by secret ballot of the members in good standing voting at a general or special membership meeting, after reasonable notice of the intention to vote upon such question, or (ii) by majority vote of the members in good standing voting in a membership referendum conducted by secret ballot. . . .

hundred thirty seven members signed in. Plaintiff's Exhibit 1. All those present voted. Tr. at 84. The retroactive dues increase passed by a vote of 208 to 26.[2] Defendant's Exhibit C.

■ Plaintiff contends that, since members received ballots exactly one hundred numbers higher than their sign-in numbers, she was deprived of her right to a secret ballot. Section 3(k) of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 402(k), defines secret ballot as the "expression . . . of a choice with respect to any election or vote taken upon any matter, which is cast in such a manner that the person expressing such choice cannot be identified with the choice expressed." *Id.* While the use of numbered ballots may not in and of itself violate § 411(a)(3)(A), there is evidence to support the inference that the Union devised and implemented a system whereby voters received ballots one hundred numbers higher than their sign-in numbers, thus enabling the Union to identify them with the choices they expressed.[3]

The evidence established that plaintiff and at least three other voters received ballots exactly one hundred numbers higher than their sign-in numbers. Tr. 141–43. It is inconceivable that in an election in which 237 members voted, that as a matter of mere coincidence, four voters would have received ballots exactly one hundred numbers higher than their sign-in numbers. The Court, therefore, finds it reasonable to conclude that plaintiff's claim is supported by the evidence.[4]

Furthermore, the Court finds that, to insure that voting members would receive ballots that were in fact one hundred numbers higher than their sign-in numbers, the members were required to receive their ballots in the order in which they signed in. Tr. 135–36, 140; *see* Tr. 24. Moreover, plaintiff testified that, when she obtained ballot numbers from other members and attempted to compare them against the sign-in numbers in the attendance book, the Union's sergeant at arms, Helen Corrigan, pulled the book away and told plaintiff, "You can't do that," a circumstance that supports an inference that the Union officials endeavored to conceal facts which would have supported plaintiff's complaint with respect to the election procedures. Tr. at 28–29.

Finally, after plaintiff complained at the meeting that the ballots were numbered, and notwithstanding suggestions from other members and the Union's own counsel that voters cut off the corner of the ballot where the number appeared, the Union's president, Dorothy Rogan, refused to do so. Tr. at 29. The Court, therefore, concludes that plaintiff has produced sufficient evidence to establish that the Union deprived her of her right to a secret ballot.[5]

**2.** While 237 persons voted, three ballots were disqualified.

**3.** The Court finds the testimony proffered by the Union regarding its reason for using numbered ballots unpersuasive, especially in view of the fact that numbered ballots had never previously been used. Tr. at 30, 71–72, 117, 124–25. Dorothy Rogan, the Union's president, testified that the ballots were numbered in order to maintain a true count of how many were printed since there had been challenges on those grounds in the past. Tr. at 78, 90, 91, 101–02. However, she was unable to recall when a challenge was last made, Tr. at 102–03, and failed to submit the correspondence which she contended would support her testimony, although the Court afforded her leave to do so. Tr. at 103. She subsequently testified that the ballots were numbered so the Union would have a total count of how many persons were present at the meeting. Tr. at 88–89. It is clear, however, and the Court so finds, that the attendance book would have provided that information.

**4.** That conclusion is not vitiated by the affidavit of Elizabeth Syzmanski, Sr., upon which defendant relies. Defendant's Exhibit A. In that affidavit, Ms. Syzmanski, Sr. states that her sign-in number was 73 and that her ballot number was 173. While it is clear from the attendance book that Ms. Syzmanski, Sr. was mistaken about her sign-in number, it does not necessarily follow that she did not in fact receive a ballot one hundred numbers higher than her sign-in number, since it is just as reasonable to infer that she was as mistaken about her ballot number as she was about her sign-in number.

**5.** There was testimony that plaintiff was offered another ballot. PTO at 5(H). That circumstance does not require a different result.

The Court rejects the testimony of defendants' witnesses that the ballots, which were consecutively numbered from 101 to 675, were divided into approximately equal piles, shuffled [6] and then handed out randomly both from the top and bottom of the pile. Tr. at 67–68, 89, 109–10. An examination of the ballots actually cast demonstrates the incredibility of that claim. Although there were almost six hundred ballots presumably available for distribution, with just three exceptions,[7] only those ballots bearing numbers 101 to 335 were actually utilized. That circumstance categorically refutes any reasonable likelihood that all of the ballots were shuffled and distributed at random. Furthermore, having had the opportunity to observe these witnesses, the Court did not find them credible.

 Since the Court finds that the plaintiff has carried her burden of showing that the voting was not secret, the defendant must establish that the outcome of the vote was not affected by that circumstance. *Hummel v. Brennan,* 469 F.Supp. 1180, 1191–92 (E.D.Pa.1979); *see Wirtz v. Hotel, Motel and Club Employees Union, Local 6,* 391 U.S. 492, 506–07, 88 S.Ct. 1743, 1751–1752, 20 L.Ed.2d 763 (1968); *Marshall v. Local Union 12447, United Steelworkers,* 591 F.2d 199, 205–06 (3d Cir.1978). The Union has not discharged that burden. The fact that the vote was 208 to 26 in favor of the dues increase is not dispositive of that issue. Defendant's Exhibit C. There was testimony that the Union controlled hiring at various of the employer theatres. Tr. at 148–50. There can be little doubt, therefore, that the chilling effect on the voters from a non-secret ballot was substantial. This Court cannot conclude from the vote itself that the outcome of the election was not affected. The defendant elicited no other evidence on this issue.

Accordingly, plaintiff is entitled to judgment. The balloting of June 20, 1980 is hereby declared null and void. The Union is directed to conduct a secret ballot ratification vote for a dues increase retroactive to January 1, 1980. *Barnes v. Sanzo,* 680 F.2d 3 (2d Cir.1982). Only those persons who were Union members on January 1, 1980, including those who have since retired, shall be entitled to vote. *Id.* Plaintiff shall recover costs, disbursements and attorney's fees.

It is SO ORDERED.

---

Firstly, an offer to supply another ballot after plaintiff made a complaint does not undercut plaintiff's claim that the election was not secret. Secondly, were plaintiff supplied a special ballot, the Court could properly infer, at least in the absence of any evidence as to how the ballot was to be selected, that defendant would have been in a position to know the number of plaintiff's ballot.

**6.** Plaintiff testified that, *after* she complained of having received a ballot 100 numbers higher than her sign-in number, she observed some ballots being shuffled. Tr. at 132–33.

**7.** Ballot numbers 341, 342, and 343 also were utilized.