Ray MARSHALL, Secretary of Labor, United States Department of Labor, Appellant,

v.

LOCAL UNION 12447, UNITED STEELWORKERS OF AMERICA, AFL–CIO, Appellee.

No. 78–1484.

United States Court of Appeals, Third Circuit.

Argued Nov. 13, 1978.

Decided Dec. 29, 1978.

Carin Ann Clauss, Sol. of Labor, Beate Bloch, Associate Sol., E. Kathleen Shahan, Atty., U.S. Dept. of Labor, Washington, D. C., Morton H. Hollander, U.S. Dept. of Justice, Washington, D. C., Francis V. LaRuffa, Regional Sol., New York City, for appellant.

A. E. Lawson, Pittsburgh, Pa., Bernard Kleiman, Chicago, Ill., Rothbard, Harris & Oxfeld, Newark, N. J., George H. Cohen, Bredhoff, Gottesman, Cohen & Weinberg, Washington, D. C., for appellee.

Before ROSENN, GARTH and HIGGIN-BOTHAM, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

This appeal requires us to interpret Section 401(b) of the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 481(b) (1976), which provides for the election by *secret ballot* of local union officers.[1] Unfortunately, section 3(k) of the Act, 29 U.S.C. § 402(k) (1976) which defines "secret ballot" does not provide the answer to all the questions raised by that term, including

---

1. Section 401(b) provides:

   Every local labor organization shall elect its officers not less often than once every three years by secret ballot among the members in good standing.
   29 U.S.C. § 481(b) (1976).

the question presented by this appeal. In this case, although facilities for a secret ballot were provided, no requirement for their use was imposed by the defendant union. Nevertheless the district court concluded that the union had discharged its obligations under the Act. Because we view the union's obligations differently, we hold that section 401(b) requires a labor organization to do more than just furnish facilities for secret balloting for those voters who desire to vote in secret. Accordingly, we reverse.

## I.

On April 27, 1976, the defendant, Local Union 12447, United Steelworkers of America (the "local"), held an election for the offices of President, Vice President and Guide. In that election, Joseph Toltin, a candidate for the Presidency, was defeated by a vote of ninety-nine to fifty-four. Thereafter on May 3, 1976, he filed a protest with the local, alleging that the election had not been conducted in a fair and legal manner. After three months had elapsed without a final decision by the parent organization, Toltin filed a complaint with the Secretary of Labor. Pursuant to section 601 of the Labor-Management Reporting and Disclosure Act (the "Act"), 29 U.S.C. § 521 (1976), the Secretary investigated the complaint and determined that there was probable cause to believe that a violation of the Act had occurred. Accordingly, the Secretary brought this action under 29 U.S.C. § 482(b) (1976) to "set aside the invalid election . . . and to direct the conduct of an election . . . under the supervision of the Secretary . . .." His complaint alleged that the local had violated section 401(b) of the Act, 29 U.S.C. § 481(b) (1976), by failing to elect its officers by a "secret ballot." He further alleged that this violation of the Act "may have affected the outcome" of the election.

At the trial held in the district court, the Secretary called three witnesses, Toltin and two other members of the local who had voted in the election on April 27, 1976. They testified that the election had been held in one room in an American Legion Hall. When a union member entered the room, he received a slip from the teller and then waited in line to be admitted to the area of the same room which was reserved for voting. When his turn came, the member would surrender his slip, receive a ballot in return, and proceed to one of the seven or eight tables in the room. Each of these witnesses testified that he received no instructions from the election officials as to where he should sit while marking his ballot. The tables were only a few feet apart, and each witness indicated that several other people were sitting at his table while voting. These witnesses also testified that there were no barriers on the tables to prevent them from observing how others were voting. Although all three testified that they could have seen their neighbors' ballots, only one testified that he did in fact see how someone else had voted.[2]

The local called as witnesses the election chairman, two members of the union who had acted as tellers during this election and one who had acted as an observer. Their description of how the election had been conducted varied from that of the Secretary's witnesses in one significant respect: they testified that there ware sixteen cardboard boxes, two taped to each table,[3] and arranged so that the voters could mark their ballots by using the boxes to shield their votes if they desired privacy. The election chairman, Cosmo Miranda, also testified that he had admitted to the voting area as many as twenty voters at a time. He stated that he had not informed the union members that, when they voted, they were to use the cardboard boxes to shield their ballots. He assumed that the tellers had instructed each voter that the boxes could be used if desired:

---

2. The testimony of Godwin Adeliyi that he had seen his friend's ballot was not considered significant by the district court because they were "close friends."

3. The election chairman testified that on one table there were no boxes.

Q. . . . Did everyone vote by making [sic] their ballots in those boxes?

A. I don't think so.

No. Some chose not to use the boxes. They marked alongside or off the table, away from the boxes.

Q. Away from the boxes.

Did people mark their ballots anywhere but on the tables?

A. Oh, I observed one or two persons marking them up against the wall.

Q. Did you instruct anyone to mark their ballot inside a box?

A. I didn't instruct anyone how to vote or how to mark their ballots. It was up to the observers or the tellers to tell them that.

. . . . .

Q. You saw people marking the ballots on the walls and did not encourage them or tell them to mark their ballot in a box?

A. When the people came down to vote, they were told that the boxes were there for them to vote secretly and the tables were there to vote. Now, if they wanted to mark the ballots on the walls, that was their privilege to mark them on the wall.

Although Miranda estimated that 95% of the voters had used the boxes, he testified that "from the way the setup was," it was possible for those in the voting area to observe how other voters were marking their ballots.

The district court did not credit the testimony by Toltin that there were no boxes on the tables.[4] It therefore found that "there were two . . . cardboard boxes placed on each of the tables in the voting area." On the basis of this finding, the district court concluded that "the facilities were adequate to permit all who wanted to vote to vote in secret so that the way they voted

could not be observed by any other members." Therefore, it ruled that the election had been conducted by secret ballot as required by section 401(b).

The district court also concluded that if the Secretary had proven that a violation of the Act had occurred, this would have constituted a *prima facie* showing that the outcome of the election had been affected. The burden then would have been on the union to produce evidence that the outcome had not been affected. The district court noted that "there was, of course, no proof addressed to this issue. . . ."

On January 30, 1978, the district court entered judgment in favor of the local union. This appeal by the Secretary followed.

II.

The Secretary does not challenge the district court's finding that there were cardboard boxes on the tables or the district court's conclusion that those boxes, if they had been used by the members, would have been adequate for secret balloting. Accepting these findings, the Secretary contends that, for a local union to discharge its obligation under the Act, it must do more than provide facilities adequate for those who wish to vote in secret to do so; it must also *require* its members to use those facilities when they vote. In particular, the Secretary interprets the Act as mandating the local to instruct all voters that they *must* mark their ballots in secret. The evidence in the record, fairly assessed, demonstrates that the voters were not instructed that they *must* place their ballots inside the boxes while they voted. Indeed, the election chairman testified, as a witness for the local, that more voters were admitted to the voting area than there were boxes available for their use. Moreover, the election chairman and the Secretary's witnesses[5] stated,

---

4. In reaching this conclusion, the district court relied particularly on the undisputed testimony that neither Toltin nor any of his supporters had protested the manner in which the election had been conducted until after the results were announced.

5. Although it is not clear whether the district court found Toltin not to be credible at all or only with regard to the presence of boxes on the tables, we do not give any consideration to his testimony. We do, however, consider the testimony of the other two government wit-

without contradiction, that it was possible to observe how some voters were marking their ballots.

Therefore, we must determine whether, as a matter of law, the secret ballot requirement of section 401 is satisfied where a union does not *require* each voting member to use the facilities available for secret balloting in an election. The legislative history of the Act is silent on this point.[6] Therefore, we must look to the language of the statute and be guided by a consideration of the effect which the district court's decision would have on the objectives of the Act.

### A

The language of the Act supports the view that a local union must do more than ensure that its members may vote in secrecy if they so choose.[7] Section 401(b) provides that a local labor organization "shall elect its officers . . . by secret ballot . . . ."[8] A secret ballot is defined in section 3(k) of the Act as "the

expression by ballot, voting machine, or otherwise, but in no event by proxy, of a choice with respect to any election or vote . . . which is cast in such a manner that the person expressing such choice cannot be identified with the choice expressed."[9] The definition is phrased in mandatory terms: the ballots must be marked in such a manner that the voter *cannot* be identified with his choice. It is clear that in this election *some* voters *could* have been identified with their choices.[10] It is also clear that the union did not take the steps which would have made certain that voters could not be identified with their preferences. The flow of voters into the voting area was not controlled. More members were permitted to vote at one time than there were boxes available to them for their individual use. Instructions were not given to voters that they must shield their ballots inside the boxes while they marked them.

nesses which was in most respects consistent with that of the defense witnesses and which was disregarded by the district court only insofar as it concerned the presence of boxes on the tables.

**6.** In *Wirtz v. Hotel Employees Union, Local 6,* 391 U.S. 492, 504, 88 S.Ct. 1743, 1750, 20 L.Ed.2d 763 (1968), the Supreme Court discussed the legislative history of Title IV of the Labor-Management Reporting and Disclosure Act. In particular, it recognized that "Congress' model of democratic elections was political elections in this country," and found that a union bylaw which set qualifications for candidates much more restrictive than those in political elections ran afoul of the Act. We note here that state election laws ordinarily *require* that voters in political elections mark their ballots in secret, and some make it a misdemeanor to do otherwise. For example, 19 N.J. Stat. Ann. § 15–26 (1964) provides in part that:

> . . . The voter shall prepare his ballot in the booth secretly and screened from the observation of others.
>
> Any person or voter who shall violate the provisions of this section shall be deemed guilty of a misdemeanor and shall be punished by a fine not exceeding five hundred dollars or by imprisonment not exceeding one year or both at the discretion of the court.

**7.** "The starting point in every case involving construction of a statute is the language itself." *Blue Chip Stamps v. Manor Drug Stores,* 421

U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring); *see Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 197, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

**8.** 29 U.S.C. § 481(b) (1976).

**9.** 29 U.S.C. § 402(k) (1976).

**10.** Other than one union member (*see* note 2 *supra*) whose testimony was not credited by the district court judge, there was no other testimony that anyone in fact observed how voters marked their ballots. The evidence showed only that, because of the way the election was conducted, it was *possible* to observe how some voters had marked their ballots. This, we believe, was sufficient to show a violation of the Act where reasonable steps have not been taken to require members to vote in secrecy. Section 3(k) provides that an election meets the secrecy requirement only if votes are "cast *in such a manner* that the person expressing such choice *cannot* be identified with the choice expressed" (emphasis supplied). It is evident from the italicized language that the statutory standard for secrecy focuses on the adequacy of the method by which voting was conducted. Once it is shown that that method was deficient because voters *could* have been identified with their choices, there is no additional requirement that union members come forward to testify that they took advantage of this opportunity to view other voters' ballots.

The local, however, contends that this interpretation of the Act runs contrary to the Secretary's own regulations. The Department of Labor's Interpretive Bulletin, 29 C.F.R. § 452.97(a) (1977), provides in pertinent part:

> Secret ballot.
>
> A prime requisite of elections . . . is that they be held by secret ballot. . . . A secret ballot under the Act is "the expression by ballot, voting machine, or otherwise, but in no event by proxy, of a choice * * * cast in such a manner that the person expressing such choice cannot be identified with the choice expressed." Secrecy may be assured by the use of voting machines, or, if paper ballots are used, by providing voting booths, partitions, or other physical arrangements permitting privacy for the voter while he is marking his ballot.

(footnote omitted). The union, relying on the use of the word "permitting" in the regulation, interprets the regulation as only requiring that a union provide voting facilities which make it possible for those who wish to vote in secret, to do so.

■ This interpretation misses the mark. The union, by focusing on one discrete clause—"physical arrangements permitting privacy"—has not given that phrase its true content in the context of the full regulation. In context, it is clear that the word "permitting" refers not to a voter's choice of secrecy, or whether secrecy is "permitted" as contrasted with being "required"— but rather to a judgment as to whether the physical conditions under which the election was conducted were such that "[s]ecrecy [was] assured."

This view of the regulation was adopted by the Court of Appeals for the Seventh Circuit in *Brennan v. Local 3489, United Steelworkers*, 520 F.2d 516 (1975). In that case, the local union had argued for a permissive interpretation of the regulation but that court held, as do we, that the union has a duty to assure that the ballots are marked in secret:

> . . . under this regulation a voting booth "or other physical arrangements permitting privacy for the voter" may be used to assure the secrecy of the ballot, but secrecy must be assured. Since the use of the secret ballot is mandatory and not optional, the arrangements for voting at the June 1970 election satisfy neither the statute nor the regulation.

*Id.* at 522.

The trial court in *Brennan v. Local 3489* had refused to order a new election, finding that the balloting arrangements were adequate to secure secrecy for those voters who desired it. On appeal, the Court of Appeals for the Seventh Circuit reversed, holding that "the secret ballot is mandatory:"

> Defendants' argument that every voter had an opportunity to make his ballot secret by going to an unpopulated area within the large room or to one of the small rooms or by guarding his vote from observation must fail. But see *Shultz v. Local 420, Aluminum Workers*, 74 LRRM 2281 (N.D.N.Y.1970). The statutory mandate is for a vote that "cannot" be identified with the voter. In many cases, requiring a union member to make a great show of securing his secrecy may be tantamount to indicating his vote. The Act requires a mandatory secret ballot, not one permitting a voter to mark his ballot in secret with the danger of identification implicit in securing that secrecy.

We have no doubt that the election procedures under review in the present case represent a great improvement over those considered in *Brennan*. However, they share the circumstance that the voters were not required to mark their ballots in secret, and some in fact did not do so. As the Seventh Circuit held in *Brennan*, we now hold that a local union is required to take all reasonable steps to assure that every voter marks his ballot in secret.

### B

■ The "secret ballot" requirement was intended to assure that a voter "cannot be identified with [his] choice." 29 U.S.C. § 402(k) (1976); 29 C.F.R. § 452.97(a) (1977).

If the union does not require that the facilities provided for secret balloting be used, each voter must necessarily choose whether or not to hide his vote from the other union members present. This choice must be made while partisans of the candidates, including the union officials conducting the election, may be observing his actions. In some cases, the very exercise of this choice in favor of a secret vote may identify the voter as a dissident or at the least may chill the exercise of the voter's free choice. To subscribe to the construction urged upon us by the local would in our view undercut the salutary role of section 401(b) in the statutory scheme of the Act.

The union has suggested that the result which we reach today will be unreasonably burdensome for local labor organizations, because they will not be able to persuade recalcitrant voters to mark their ballots in secret. We observe only that measures, which were neither expensive nor difficult, could have been taken to ensure that each voter marked his ballot in secrecy. At the least, the election officials could have instructed all of the union members that they *must* use the boxes when they voted. The number of voters admitted to the balloting area could have been limited to coincide with the number of boxes available.

The union further contends that our holding will have the effect of requiring unions to obtain and use voting booths or machines in all elections, even though the regulation provides that "other physical arrangements" are acceptable if they assure secrecy. 29 C.F.R. § 452.97(a) (1977). But we are concerned here *not* with the type of physical facilities available for secret balloting, but with the requirement that such facilities—whatever they may be—be used by the members of the union when they mark their ballots. Our decision would be no different if the union had provided more sophisticated voting equipment but had nevertheless permitted union members the choice of voting in such a way that they could be identified with their election choice.

We therefore conclude that the secret ballot requirement of section 401(b) is concerned with more than the physical arrangements for balloting. A union must also take every reasonable precaution to ensure that the facilities available for balloting are used in a manner similar to their use in political elections in this country, i. e., in such a manner that voters cannot be identified with their choices.

### III.

Having determined that the failure of the union to *require* voting secrecy constituted a violation of section 401(b), we turn now to the question of the relief to be afforded. The Secretary, in his complaint, seeks an order declaring the April 1976 election void and directing the union to conduct a new election under the Secretary's supervision. Section 402(c) of the Act, 29 U.S.C. § 482(c) (1976), provides that a violation of the Act shall result in the holding of a new election under the Secretary's supervision only if it "may have affected the outcome of an election."

Virtually no argument or discussion concerning the application of section 402(c) to this case appears in the Secretary's or the union's briefs. The Secretary devotes but one paragraph to this issue, stating:

"Appellee further argues that if the Act's secrecy requirements were violated, the outcome of the election was not affected. The district court accepted plaintiff's contention 'that a showing of a violation of the secrecy requirements of the Act constitutes a *prima facie* demonstration that the outcome of the election was affected.' (A.122) The Court noted that 'the burden of coming forward is then thrust upon the defendant,' and that 'there was . . . no proof addressed to this issue.' (*Ibid.*) Accordingly, if this Court accepts our contention that the Act's secrecy requirement was violated, a new election must be ordered."

Reply Br. for the Appellant at 5. We can find no fault with the district court's interpretation of section 402(c), on which the appellant now relies. In *Wirtz v. Hotel*

*Employees Union, Local 6*, 391 U.S. 492, 506–07, 88 S.Ct. 1743, 1752, 20 L.Ed.2d 763 (1968), the Supreme Court held that proof of a violation of section 401, without more, has "the effect of establishing a prima facie case that the violation 'may have affected' the outcome [of the election]. This effect may of course be met by evidence which supports a finding that the violation did not affect the result."

In this case we are faced with a *prima facie* showing that the result of the election was affected by the violation of the secret ballot requirement, with no proofs adduced before the district court to rebut that showing. It may be contended in an appropriate case that a violation of the secrecy provision of the Act requires, without more, the nullification of the election. Here, however, we need not go that far, nor need we reach that issue, for in this case the district court has recognized, and our independent review has confirmed, that the union offered no evidence to rebut this showing. In such a circumstance, it is appropriate that we afford the Secretary the relief which is provided for in 29 U.S.C. § 482(c) (1976) and which is sought in the complaint.

### IV.

The order of the district court dated January 30, 1978 will therefore be reversed and the case remanded to the district court with directions: (1) to enter an order declaring the April 27, 1976 election void; and (2) to direct that a new election be conducted under the supervision of the Secretary pursuant to 29 U.S.C. § 482(c) (1976).