653 F.Supp. 500 (1987)
Ivan MYERS, A.C. Laubinger, Terry Dougan, Larry Blankenship, Shelton Singer, Billy G. Howard, Henry J. Rowles, individually and on behalf of all other persons similarly situated, Plaintiffs,
v.
HOISTING AND PORTABLE LOCAL 513, affiliated with the International Union of Operating Engineers, AFL-CIO, also known as Local 513, International Union of Operating Engineers, AFL-CIO; Jack Martorelli, individually and as President-Business Manager of International Union of Operating Engineers, Local 513 AFL-CIO; James F. Davis, individually and as Vice President of International Union of Operating Engineers, Local 513 AFL-CIO; Sylvester Modglin, individually and as Financial Secretary of International Union of Operating Engineers, Local 513 AFL-CIO; John C. Nava, individually and as Recording Secretary of International Union of Operating Engineers, Local 513 AFL-CIO; Jack Sawyer, individually and as Treasurer of International Union of Operating Engineers, Local 513 AFL-CIO; John Byrne, individually and as Trustee and Member of Executive Board of International Union of Operating Engineers, Local 513 AFL-CIO; and Roy Siegler, individually and as Trustee and Member of Executive Board of International Union of Operating Engineers, Local 513 AFL-CIO, Defendants.
No. 82-408C(2).
United States District Court, E.D. Missouri.
January 14, 1987.
*501 *502 Kenneth W. Shrum, Marble Hill, Mo., for plaintiffs.
Gruenberg, Souders and Levine, Barry J. Levine, St. Louis, Mo., for defendants.

MEMORANDUM
FILIPPINE, District Judge.
This matter is before the Court for a decision on the merits following trial to the Court. The parties have filed post-trial briefs and responses thereto. The Court adopts this memorandum and opinion as its findings of fact and conclusions of law. Fed.R.Civ.P. 52.
As of June 22, 1981, plaintiffs, Ivan Myers, A.C. Laubinger, Terry Dougan, Larry Blankenship, Shelton Singer, and Billy G. Howard, were members of Hoisting and Portable Local 513. Hoisting and Portable Local 513 is a labor organization engaged in the representation of employees in the operating engineer craft and industry in interstate commerce with offices at 2433 South Hanley, St. Louis, Missouri, and is within the jurisdiction of this Court. Defendant Local 513 is the sole, exclusive bargaining agent for the plaintiffs and for all members of Hoisting and Portable Local 513. Hoisting and Portable Local 513 is party to collective bargaining agreements with various employers within the jurisdiction of Hoisting and Portable Local 513.
Defendant Jack Martorelli is President and Business Manager of Local 513. Defendant James F. Davis is Vice President of Local 513. Defendant Sylvester Modglin is Financial Secretary for defendant Local 513. Defendant John C. Nava is Recording Secretary for Defendant Local 513. Defendant Jack Sawyer is Treasurer of Defendant Local 513. Defendant John Byrne is a Trustee and member of the Executive Board of defendant Local 513. Defendant Roy Siegler is a Trustee and a member of the Executive Board of defendant Local 513.
Hoisting and Portable Local 513 had approximately 4700 members as of June 22, 1981. As of June 22, 1981, defendant Local 513 was the sole and exclusive bargaining agent for its members, and was party to collective bargaining agreements with Associated General Contractors of Missouri; Associated General Contractors of St. Louis; Site Improvement Association; Fred Weber, Inc.; Missouri Builders Association; Southeast Missouri Builders Association; Asphalt Pavers; and Home Builders Association. In addition, as of June 22, 1981, Local 513 was the sole and exclusive bargaining agent for its members and was party to collective bargaining agreements *503 with other independent contractors who had signed agreements which contained provisions for the possible implementation of supplemental dues and the withholding of supplemental dues from wages of Local 513 members if the membership implemented a supplemental dues program. As of June 22, 1981, approximately 2700 members of Local 513 were subject to collective bargaining agreements signed by Local 513 which made provisions for the possible implementation of supplemental dues. The collective bargaining agreements which provided for the possible implementation of supplemental dues were primarily for members who worked in construction. The balance of the membership consisted in large part of mechanics, quarry employees, sand plant employees, ready mix plant employees, and retired members, none of whom were subject to collective bargaining agreements which provided for the implementation of supplemental dues.
A special meeting of Local 513 was called for and held on June 22, 1981, at four locations, namely, St. Louis, Missouri; Hannibal, Missouri; Jefferson City, Missouri; and Cape Girardeau, Missouri; for the purpose of voting on implementing a supplemental dues program for all Local 513 members affected by the following agreements: Associated General Contractors of Missouri; Associated General Contractors of St. Louis; Site Improvement Association; Fred Weber, Inc.; Missouri Builders Association; Southeast Missouri Builders Association; Asphalt Pavers; and Home Builders Association. The June 22, 1981, election also affected Local 513 members employed by independent contractors who had signed agreements in one or more of the above forms. As a result of the election held on June 22, 1981, the defendants announced a vote of 647 "Yes" and 300 "No" votes at the St. Louis, Missouri, location; a vote of 103 "Yes" and 59 "No" votes at the Jefferson City, Missouri, location; a vote of 125 "Yes" and 12 "No" votes at the Cape Girardeau, Missouri, location; and a vote of 12 "Yes" and 58 "No" votes at the Hannibal, Missouri, location; for a total vote of 887 "Yes" votes and 429 "No" votes.
At the July 10, 1981, regular meeting of Local 513 membership in St. Louis, Missouri, plaintiff Ivan Myers made an oral and written request of the defendant officers of Local 513 that the dues increase election held at the June 22, 1981, meeting be declared invalid and of no force and effect. Plaintiff Ivan Myers further requested that the June 22, 1981, election not be certified as a valid election for dues increase and that no increased dues be assessed or imposed until a valid election was held authorizing such increased dues. The request by plaintiff Ivan Myers on July 10, 1981, gave various reasons including a claim that the voting was not by secret ballot. That request was denied by defendant Jack Martorelli in the meeting of July 10, 1981. Thereupon plaintiff Ivan Myers, together with other Local 513 members, appealed that decision to the Executive Board of Local 513 on August 11, 1981, at the Executive Board meeting of Local 513. At this meeting, the defendants again denied the request of plaintiff Ivan Myers to set aside the election for supplemental dues. Thereafter, on September 9, 1981, plaintiff Ivan Myers appealed the decision of Local 513 concerning his request for new supplemental dues election to the International Union of Operating Engineers. Plaintiff Ivan Myers and other plaintiffs attended a hearing before the International Union of Operating Engineers on their request for a new supplemental dues election. That appeal was denied by the International Union of Operating Engineers. Following the denial of plaintiffs' appeal by the International Union of Operating Engineers, plaintiffs instituted this action against Local 513 and its managing agents and directing representatives individually and in their official capacities. Plaintiffs allege violations of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. §§ 401 et seq. ("LMRDA"). Plaintiffs allege that the individual defendants by utilizing their official positions and the control over defendant Local 513 attendant upon such positions, failed to conduct the dues increase or *504 levy of special assessment election of June, 1981, in accordance with the provisions of 29 U.S.C. § 411(a)(3) and the constitution and by-laws of Local 513. Plaintiffs assert that the dues increase was not determined by a majority vote by secret ballot of the members in good standing after reasonable notice of the intention to vote upon such question had been given to all members. Further, plaintiffs allege that defendants prevented certain eligible members from voting by giving the appearance that the election did not affect all members and that not all members were eligible to vote.
Plaintiffs seek a declaratory judgment that the dues assessment election was invalid, a preliminary and permanent injunction restraining the union from collecting the increased dues, an accounting conducted by an independent master so that the increased assessments may be returned to the individual members, and a declaratory judgment that certain by-laws be presented to the membership for a vote at a regular meeting.
The Court certified this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2) on March 28, 1984, and ordered that the class should consist of all members of Hoisting and Portable Local 513 except the defendants in this action.
Defendants argue at length in their post trial briefs that this action is barred by the restrictions of Section 411(a)(4) of LMRDA because plaintiff Larry Blankenship is an employer and the Act prohibits employer-sponsored litigation against the officers of a labor organization. Defendants cite as support Blankenship's testimony at trial that he is no longer a member of the union,[1] defendants' opening statement, and deposition testimony by Blankenship which, contrary to defendants' claim, was never offered into evidence at trial.
The Court finds defendants' allegations of employer-sponsored litigation made in the post-trial brief are completely unsupported by the oral or documentary evidence adduced at trial and that Blankenship's testimony at trial likewise does not support a finding of employer-sponsored litigation prohibited by LMRDA § 411(a)(4). See Fed.R.Civ.P. 52(a).
Defendants maintain that plaintiffs' action must be dismissed because they failed to exhaust internal union remedies with regard to all the issues.
*505 The Supreme Court addressed the issue of exhaustion in an alleged election violation case stating:
[A]ny interpretation of the exhaustion requirement must reflect the needs of rank and file union members  those people the requirement is designed ultimately to serve.... [I]n determining whether the exhaustion requirement of § 402(a) has been satisfied, courts should impose a heavy burden on the union to show that it could not in any way discern that a member was complaining of the violation in question."
Hodgson v. Local Union 6799, United Steelworkers of America, AFL-CIO, 403 U.S. 333, 340-41, 91 S.Ct. 1841, 1846, 29 L.Ed.2d 510 (1971). See also Brock v. International Union of Operating Engineers, Local Union No. 369, AFL-CIO, 790 F.2d 508, 512 (6th Cir.1986); Donovan v. Local 3122, Communications Workers of America, 740 F.2d 860, 861 (11th Cir. 1984); Donovan v. Missouri Pacific System Federation Joint Protective Board of the Brotherhood of Maintenance of Way Employees, AFL-CIO, 737 F.2d 445, 448 (5th Cir.1984). When a member is aware of facts supporting an alleged violation, he must indicate such facts to the union in some discernable manner. Hodgson, 403 U.S. at 341, 91 S.Ct. at 1846.
In this case, the plaintiffs did exhaust their claims with the union. The written request by Ivan Myers read at the July 10, 1981, regular membership meeting and relied on by Myers at the hearing before the Executive Board on September 9, 1981, did address the issue of lack of control over the voting procedure by the union officials and their duty to maintain control, and the failure to provide for a secret ballot. Myers stated in his appeals that he saw ballots passed out the window and further discussed the crowded and uncontrolled conditions under which the vote took place. Although the evidence shows he refused to give names of others who had also witnessed ballots passed out the window, the Court finds the union was able to discern that the method of control and the lack of a secret ballot were the violations of which Myers was complaining. The issue of lack of reasonable notice was apparently not addressed by Myers at the general membership meeting, nor at the appeal before the Local 513 Executive Board. Nevertheless, it was considered in the appeal before the International Union of Operating Engineers and a finding of reasonable notice was included in the General Executive Board's Conclusions and Recommendations.
The Court therefore finds that the internal union appeals were satisfactorily exhausted and the matter is now properly before this Court.
At the May 8, 1981, regular membership meeting, the supplemental dues increase was briefly discussed. President Martorelli indicated that the proposed dues increase would be 2½% or more but that the exact figure would not be known until the auditor presented the final projected expense figures to him.
The decision that the amount of the supplemental dues would be 2½% was made between the regular membership meeting of May 8, 1981, and the Executive Board meeting of June 9, 1981. On June 8, 1981, a letter was sent by defendant Jack Martorelli as prepared by defendant John Nava directing the publication of a notice of a special meeting to vote on a supplemental dues proposition to the St. Louis Labor Tribune. The notice of the special election for June 22, 1981, was published in the June 11, 1981, and June 18, 1981, issues of the St. Louis Labor Tribune and read as follows:
SPECIAL NOTICE: A special meeting is being called by Local 513, International Union of Operating Engineers for Monday, June 22, 1981, at 8:00 p.m. to be held at the following locations: St. Louis 2433 South Hanley, St. Louis, MO; Hannibal  3533 Market, Hannibal, MO; Jefferson City, 209 Flora, Jefferson City, MO; Cape Girardeau, 815 Enterprise, Cape Girardeau MO. The purpose of the special meeting will be for voting on implementating supplemental dues program *506 for all union members affected by the following agreements: Associated General Contractors of Missouri; Associated General Contractors of St. Louis; Site Improvement Association; Fred Weber, Inc.; Missouri Builders Association; Southeast Missouri Builders Assn.; Asphalt Pavers; Home Builders Assn. Members employed by independent contractors who have signed an agreement in one of the above forms will also be eligible to vote. All other members who are not affected by the above agreements are not required to vote on supplemental dues. In order to be eligible to vote a member must present his paid-up dues book at the door.
At the June 12, 1981, regular meeting of Local 513, President pro-tem Bonzani announced that he would defer discussion of the supplemental dues issue until the special meeting where President Martorelli would give a full explanation of the facts and figures projected by the auditor.
Other than the notice in the St. Louis Labor Tribune, the only other written or published notice relating to the supplemental dues proposition was a letter sent to job stewards at certain of the larger quarries, ready mix plants, sand plants and mechanic shops. That letter was sent by John Nava on June 3, 1981, and requested that the job stewards post a notice which indicated that the special meeting was to vote on supplemental dues for members who work in construction and stated: "Therefore, your presence at this meeting is not required as this vote does not change your dues structure."
On the night of June 22, 1981, those members that first arrived at the St. Louis union office entered the hall without any verification of their standing in the Union. These persons, except the union officers, were requested to leave the union hall and to come back in through the southeastern door after their dues book had been checked by the Sergeant at Arms, Charles Lindsey, and Robert Henson who had been asked to assist Lindsey. Those individuals that attempted to gain entrance to the union hall without evidence of a paid-up dues card were sent to the office for a receipt for payment, or other evidence that the member's dues were paid before they were admitted.
The union hall was filled by the time the meeting began at approximately 8:00 p.m. Not only were all 250-300 chairs filled, but members were standing three to four deep along the north and south walls and up to ten deep at the back or east end of the meeting hall. The center aisle, three and four abreast, was likewise filled with members. An estimated 50-150 members also congregated on the outside of the building to the south. The attendance at this meeting was the largest seen by long time members of the union.
Martorelli advised the membership of the dues situation and the amount in question. After Martorelli explained the proposed changes in the dues structure, questions were asked him from the floor. Those persons standing in the rear of the hall (east side) had no trouble hearing what was asked or what was said. Michael Owens and Robert Darby were outside the hall during the meeting and they testified that they had no trouble hearing Martorelli's comments or explanation of the matters in question. No one on the outside raised any complaint that night about not being able to hear what was transpiring.
After Martorelli had explained the subject matter of the vote and all questions had been asked and answered, ballots were passed out to the members present in the union hall. The ballot was a preprinted piece of paper with two boxes under a legend "OFFICIAL BALLOT." One box was next to a "YES" and the other box next to "NO". The member would signify voting for the supplemental dues by checking the yes box, and against by checking the no box.
Martorelli designated Jasper "Irish" Signorino to pass out the ballots together with Charles Hope and some others. The method of distribution is not contested as the distributors came to an aisle, the first person on the aisle was given some ballots *507 from which he was to take one and pass the remainder to the person next to him, and so on. Upon receiving a ballot, the individual then marked the box desired and carried the ballot to the front of the hall (west side) and deposited the ballot in a ballot box which was on the northern part of the podium at the western side of the union hall. The ballot box and the line of members preparing to drop their ballot in the box was under the observation of Del Goebel, John Colligan, Donald Mooney and others. The ballot box observers were stationed at the box to insure that no person voted more than once and that no person dropped more than one ballot in the box. Each witness was asked if he or she saw anyone vote more than once or drop more than one ballot in the box and the answers were uniformly in the negative.[2]
It was the duty of Lindsey and his assistant Henson to check the dues card of each person entering the voting place. After the members who were in the hall at the commencement of the meeting began filing out of the meeting hall, those members on the outside were permitted into the voting area after having their dues books checked at the southeastern door by Lindsey or Henson. Charles Hope then gave a ballot to these members as they passed through the door. No witness testified that anyone was permitted in the hall or cast a ballot that was not a member in good standing in Local 513. No member that requested to vote in the election was denied that right and even though the dues of shop mechanics, quarry workers and others were not affected by the vote, those members were permitted to vote if they so chose.
Members, after voting, exited the Union hall by either the northeast door which lead into an alley, or through the dispatchers area just north of the southeast most doorway. At first the southeast door was used for members to leave the hall, but shortly after the voting started those members on the inside were requested to use a different exit. Many of the members left the premises after voting and did not wait for the ballot count.
Most members followed a line along the north wall of the hall to the ballot box by the podium. Some came up the center aisle, although this group was in the minority.
After the voting was completed the ballots were counted by appointed counters at the podium area. Signorino was in charge of the count upon direction from Martorelli. Signorino emptied the ballot box and placed the ballots in three or more piles. The ballots were separated by yes and no vote and then stacked in piles of 50 each.
Each counter then brought the piles to Signorino who entered the count on the tally sheet.[3] During the ballot count many members observed the proceedings. Plaintiff Laubinger was standing next to Signorino as the vote was recorded, and neither he, nor anyone else, complained about the count or the recording of it.

Reasonable Notice
Plaintiffs contend that notice of the special meeting was inadequate in that each member should have received written notice, the notice should have included the amount of the proposed dues change, and notices posted indicating that some members were not required to attend prohibited those members from attending.
Title 29, United States Code § 411(a)(3)(A) concerns the rights of members of labor organizations with regard to dues, initiation fees, and assessments:
Except in the case of a federation of national or international labor organizations, the rates of dues and initiation fees payable by members of any labor organization in effect on September 14, 1959 shall not be increased, and no general or *508 special assessment shall be levied upon such members, except 
(A) in the case of a local labor organization, (i) by majority vote by secret ballot of the members in good standing voting at a general special membership meeting, after reasonable notice of the intention to vote upon such question, or (ii) by majority vote of the members in good standing voting in a membership referendum conducted by secret ballot....
The by-laws of defendant Local 513 include the following provisions regarding supplemental dues assessments and general and special meetings:
Section 16.10: General or Special Assessments and levies may be made from time in the manner provided hereinafter:
Any increase in the rate of dues or initiation fees or the levying of any general or special assessment by the Local Union shall be made at a general or special membership meeting in accordance with the following procedures;
(1) Reasonable notice shall be given of the meeting at which the membership will consider the question of whether or not such dues, initiation, or reinstatement fees, general or special assessment shall be increased or levied. The notice shall indicate that a proposed increase or assessment is to be voted on.
(2) At the meeting called as provided in this Section, voting shall be secret ballot of the members in good standing.
(3) A majority vote by secret ballot of the members in good standing voting at such meeting shall decide this issue.... Section 17.01: Subject to the provisions of Section 17.02 ..., there shall be a general membership meeting of this organization once each month....
Section 17.02: The Executive Board shall have the power to authorize meetings by Charter, Geographical or Industrial area, provided, however, that all matters, which apply to the General Membership of this organization must be approved at the regular membership meeting.
Section 17.03: Special Meetings, general or as specified in Section 17.02, may be called by the Executive Board whenever they are deemed necessary. Advance notice of the time, place and business to be conducted shall be given to the membership and only the business specified shall be considered at the meeting. Dues books must be in possession of members at any meeting where a secret ballot vote will be taken....
The test to determine reasonableness under § 411(a)(3)(A) is whether the notice "descends to particulars, and the ordinary union member, attentive to the interests he has at stake in such a situation, is, in some manner, thereby made aware of the specific issue to be voted upon a reasonable time in advance of the meeting." Gates v. Dalton, 67 F.R.D. 621, 628 (E.D.N.Y.1975) (notice unreasonable where newspaper notice of regularly scheduled meeting did not mention vote on dues to be taken at meeting); Hummel v. Brennan, 469 F.Supp. 1180, 1190 (E.D.Pa.1979) (notice inadequate because posted notices of general membership meetings failed to indicate vote on dues increase would be taken and because most shop units had less than one week notice of scheduled meeting).
In the present case, a dues increase was mentioned at the two prior general membership meetings, notice of the June 22 meeting was published in the St. Louis Labor Tribune on June 11, 1981, and June 18, 1981, indicating the time, place, and business to be conducted, and notices were posted which referred to the published newspaper notices in an effort to clarify which members would be affected by a dues increase. Neither the statute nor the by-laws require individual notice or that the notice contain the amount to be voted upon. Finally, the heavy turnout at the special meeting suggests that the notice was adequate. Thus, the Court finds that notice of the special meeting to vote on a supplemental dues assessment satisfied the requirement of reasonableness in accordance with the applicable statute, by-laws, and their common law interpretation.

*509 Secret Ballot

Plaintiffs claim that the vote was improper because it was not by secret ballot and must therefore be declared invalid. 29 U.S.C. § 411(a)(3)(A) requires that a vote to increase dues be "by secret ballot of the members in good standing." The term "secret ballot" is defined in 29 U.S.C. § 402(k):
"Secret ballot" means the expression by ballot, voting machine, or otherwise, but in no event by proxy, of a choice with respect to any election or vote taken upon any matter, which is cast in such a manner that the person expressing such choice cannot be identified with the choice expressed.
In Marshall v. Local Union 12447, Steelworkers of America, AFL-CIO, 591 F.2d 199 (3rd Cir.1978), the question before the Court was whether furnishing facilities for a secret ballot in a local union election was sufficient to satisfy the secret ballot requirement. In Marshall, a room was set aside for voting furnished with eight tables, each having two cardboard boxes to act as a shield for marking ballots. Testimony indicated that as many as twenty voters were admitted to the voting room at one time but they were not required to use the cardboard shields when voting and in fact many did not use them. Only one person testified that he saw how another voted and the district court discounted the testimony because the witness was "close friends" with the voter. In holding the election void, the third circuit interpreted the § 402(k) definition of secret ballot and its stated purpose that a person cannot be identified with his choice, to mandate unions to take every reasonable precaution to provide and ensure secret ballot facilities are used. Marshall, 591 F.2d at 205.
While Marshall was concerned with the election of officers for the local union, § 402(k) is equally applicable to § 411(a)(3)(A) regulating dues assessments. In Hummel v. Brennan, 469 F.Supp. 1180 (E.D.Pa.1979), the court relied on the reasoning in Marshall to issue a preliminary injunction prohibiting collection of an increased dues assessment where, among other problems, the voting was not by secret ballot. In Hummel, the voting took place at a hall where chairs were set up in rows and after a head count of each row, the appropriate number of ballots were distributed to the person at the end of the row, who proceeded to pass them down the row. Voters marked the ballots in their laps, although some people did move to the other side of the hall to vote. No pencils were provided so persons had to borrow pencils from their neighbors. After marking their ballots, voters then proceeded to the ballot box at the side of the room to deposit their ballots. No tables or a designated area were provided and no checkoff procedure instituted to ensure only members in good standing were permitted to vote.
The facts in the present case are similar in that ballots were handed out by rows and marked by members sitting or standing in close proximity to one another. No facilities were provided to permit secret voting. Several of the plaintiffs' witnesses testified that ballots were passed out the windows of the hall to members standing outside the building. While such an occurrence would certainly suggest a lack of control over the voting procedures, failure to provide and require use of facilities that would ensure that a voter could not be identified with his choice is sufficient to find a violation of the secret ballot requirement of § 411(a)(3)(A).
Defendants argue plaintiffs have not shown that the election was affected by lack of secret ballot facilities.
The Court agrees with the response in White v. King, 319 F.Supp. 122, 124-125 (E.D.La.1970), when that court addressed this very argument:
We are unable to perceive the basis of defendant's argument. Section 411(a)(3)(A) requires in clear and unmistakable language a secret ballot for any dues increase. A requirement of prejudice is nowhere mentioned. This section is part of a subchapter to the LMRDA entitled "Bill of Rights of Members of Labor Organizations." As a remedial *510 statute, it is not to be read narrowly so as to derogate any of the rights granted by Congress to American working men. Where no requirement of prejudice exists, none should be read in. The requirement of a secret ballot is an absolute protection for the working man, and any vote that dispenses with it is invalid as repugnant to the statute. See King v. Randazzo, 346 F.2d 307 (2d Cir.1965).
Thus once a violation of the secret ballot requirement has been found, a prima facie case has been established and the burden shifts to the union to show that the violation did not affect the outcome. E.g., Marshall, 591 F.2d at 206; Hummel, 469 F.Supp. at 1191; see Usery v. Stove, Furnace & Allied Appliance Workers International Union of North America, AFL-CIO, 547 F.2d 1043, 1046 (8th Cir.1977). Defendants have offered no evidence to show that the outcome was not affected by the lack of a secret ballot vote. While the evidence shows that there was some control by the union over the vote at the door to the hall and at the ballot box, the meeting can at best be described as informally conducted. Two persons were stationed at the front door to ensure only members in good standing were allowed into the hall; however, there was contradictory evidence as to whether every member was checked and even Charles Lindsey, who was stationed at the door, admitted that he had let a few people in without checking their books.[4] Watchers were stationed at the ballot box to ensure only one ballot per person was dropped in, but with nearly a thousand members voting in two shifts under the crowded conditions of the hall, without a checkoff procedure someone could have circled around the hall and voted again, although there was no evidence showing that someone actually did vote twice. Stacks of ballots were distributed to the rows without any assurance that only one ballot would be available per person. Furthermore, there was testimony by several of plaintiffs' witnesses that a stack of ballots had been passed out a window to members outside. Thus it is clear that control of the vote was indeed in jeopardy.
The fact that no one testified that he saw how another voted or saw anyone vote twice is not sufficient proof to show the outcome was unaffected because the evidence was clear that under the crowded conditions of the hall, voters could have been identified with their choices. "Congress required that balloting take place absent even the subtle pressure that nonsecrecy, in itself, may entail." Connor v. Highway Truck Drivers and Helpers, Local 107, 378 F.Supp. 1069, 1074 (E.D.Pa. 1974).
The Court finds that plaintiffs have established a prima facie case that the dues increase vote was not by secret ballot and defendants have offered no evidence which would rebut this Court's finding that the outcome may have been affected. Therefore the vote to increase the dues assessment must be set aside.
In determining the appropriate remedy in this case, the Court is mindful of a number of cases cited by plaintiffs which hold that a ratification vote of an improperly held dues assessment vote can only apply prospectively. See Landry v. Sabine Independent Seamen's Association, 623 F.2d 347, 350 (5th Cir.1980); Local No. 2, International Brotherhood of Telephone Workers v. International Brotherhood of Telephone Workers, 362 F.2d 891, 896 (1st Cir.1966); White v. Local 942 Laborers International Union, 90 F.R.D. 368, 370 (D.Alaska 1981); Gates v. Dalton, 441 F.Supp. 760, 765 (E.D.N.Y.1977); and Peck v. Associated Food Distributors, 237 F.Supp. 113, 115 (D.Mass.1965).
The Court recognizes, however, that under the facts of this case, applying a ratification vote retroactively is a more appropriate form of relief. While it is to plaintiffs' credit that this action was timely filed within nine months of the vote, five and *511 one half years have passed since the vote was held. It is difficult to estimate the amount of additional dues collected pursuant to that vote; however, since the increase affected approximately 2700 members, the sum is certainly great. The costs of accounting for the money collected over five and one-half years and then redistributing it to the 2700 members would likely be as harmful to the union members as it would be to the union officials. The Court agrees with the reasoning in Barnes v. Sanzo, 680 F.2d 3 (2nd Cir.1982), which relied upon a Supreme Court construction of LMRDA § 102 stating that remedies "be tailored to fit facts and circumstances admitting almost infinite variety." Barnes, 680 F.2d at 4 (citing Hall v. Cole, 412 U.S. 1, 10-11, 93 S.Ct. 1943, 1948-1949, 36 L.Ed.2d 702 (1973)). Although the Barnes court directed a retroactive ratification vote in a pretrial order, the Court finds a retroactive ratification vote is also appropriate as a post-trial remedy. Therefore, the Court will order that a retroactive ratification dues assessment vote be held at the earliest possible date in accordance with the requirements set forth in 29 U.S.C. § 411(a)(3)(A) and the by-laws of Local 513 except that only those members who were eligible to vote as of June 22, 1981, will be allowed to participate in the vote.
The final issue to consider in this case is the claim by plaintiffs of a breach of fiduciary duty against the union officials in their individual capacity. The Eighth Circuit has adopted a broad view of the scope of union officials' fiduciary duties. See Pignotti v. Local # 3 Sheet Metal Workers International Assn., 477 F.2d 825, 833-34 (8th Cir.1973); Johnson v. Nelson, 325 F.2d 646, 650 (8th Cir.1963). Relief against union officials individually, however, can only be predicated upon a showing that they acted outside their official capacities. White v. King, 319 F.Supp. at 126 (and cases cited therein).
Although the evidence indicates that the special meeting lacked the formal controls required under § 411(a)(3)(A), the Court finds that the union officials were acting within their official capacity at all times and conducted the meeting in good faith. Evidence at trial indicated that prior elections had been conducted in the same manner, which does not excuse the improper approach taken but does suggest that the union officials did not act with intent to violate their duties toward the union. Therefore the Court finds no breach of fiduciary duty by any of the defendant union officials in their individual capacities.
Since the Court has ordered a retroactive ratification vote, the Court will retain jurisdiction over the remaining issues which include any injunctive relief requested, appointment of a master, attorney's fees and costs pending determination of that vote.

JUDGMENT
In accordance with the Memorandum filed this day and incorporated herein,
IT IS HEREBY ORDERED, ADJUDGED, and DECREED that the vote held on June 22, 1981, to implement a supplemental dues program for all Local 513 members affected by the following agreements: Associated General Contractors of Missouri; Associated General Contractors of St. Louis; Site Improvement Association; Fred Weber, Inc.; Missouri Builders Association; Southeast Missouri Builders Association; Asphalt Pavers; and Home Builders Association was not conducted by secret ballot as required by 29 U.S.C. § 411(a)(3)(A) and the by-laws of Local 513 and is set aside; and further that a retroactive ratification vote shall be conducted at the earliest possible date in accordance with 29 U.S.C. § 411(a)(3)(A) and the by-laws of Local 513 except that only those members eligible to vote on June 22, 1981, shall participate in the ratification vote.
IT IS FURTHER ORDERED, ADJUDGED, and DECREED that defendants Jack Martorelli, James F. Davis, Sylvester Modglin, John C. Nava, Jack Sawyer, John Byrne, and Roy Siegler shall have judgment against plaintiffs on their claim for relief against defendants in their individual *512 capacity and that the claim be and is DISMISSED with prejudice.
IT IS FURTHER ORDERED that this Court shall retain jurisdiction as to any injunctive relief, appointment of a master, attorney's fees and costs pending determination of the retroactive ratification vote herein ordered.
NOTES
[1] Cross-examination of plaintiff Larry Blankenship by Mr. Levine:

Q. ... You said that in 1981 you were an owner-operator, is that correct?
A. Yes.
Q. Did you also employ operating engineers?
A. I did.
Q. Were you party to a collective bargaining agreement with Operating Engineers Local 513?
A. Yes.
Q. Which collective bargaining agreement were you a party to?
A. Associated Contractors. ....
Q. Are you still a party to a collective bargaining agreement with the union?
A. Yes, I am.
Q. But you are no longer a member?
A. No.
Q. When did you cease membership?
A. When they raised my dues.
Q. When was that?
A. At the June meeting.
Q. When did you stop being a member? Now, they raised your dues, is that correct?
A. Yes.
Q. And then you ceased membership?
A. I ceased paying my dues.
Q. You never paid the increase?
A. No.
Q. And you have not been a member then  well, when did you lose your membership in good standing?
A. About three months later.
Q. Okay. That was before this lawsuit was filed, wasn't it?
A. I don't really  I can't tell you exactly.
Q. If I were to tell you this lawsuit was filed in 1982, and you ceased being a member of Local 513 prior to that time, did you not?
A. It's possible.
Q. And you suffered no adverse effect, did you, from a dues increase one way or the other?
MR. SHRUM: I'm going to object. That is not material or relevant to the issues.
THE COURT: What is the relevancy, Mr. Levine?
MR. LEVINE: I will withdraw the question. I think it speaks for itself.
(Tr. X-XX-X-XX).
[2] One female member did have someone drop her ballot in the box. The exchange was made in front of the observers and was approved by them.
[3] The results of the election from Hannibal, Cape Girardeau, and Jefferson City were telephoned to St. Louis.
[4] Charles Lindsey testified at trial: "... If I knew the guy, I mean, I won't say I checked every book, and I won't say Bobby [Henson] did, but if I knew the guy, if I knew his face, I knew he was an upstanding member, I let him go ahead." (Tr. p. 4-112).